In re KIDRON, INC., Transportation Technologies, Inc., Hackney & Sons, Inc., and Hackney Brothers, Inc., Debtors.

Nos. 01–22647–8W1 to 01–22650–8W1.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

May 31, 2002.

Harley E. Riedel, II, Kurt E. Davis, Stichter, Riedel, Blain & Prosser, P.A., Tampa, FL, Charles S. Kelley, Mayer, Brown, Rowe & Maw, Houston, TX, for J.B. Poindexter.

Paul Steven Singerman, Steven B. Zuckerman, Berger Singerman, P.A., Miami, FL, for Official Committee of Unsecured Creditors.

Frank Eaton, White & Case, LLP, Miami, FL, for Cedar Acquisition Corporation.

Nicholas B. Bangos, Lawrence M. Schantz, Adorno & Zeder, P.A., Miami, FL, for Debtors.

*Memorandum Decision and Order on Creditor J.B. Poindexter & Co., Inc.'s Application for Payment of Administrative Expense Pursuant to 11 U.S.C. § 503(b)(3)(D)*

MICHAEL G. WILLIAMSON, Bankruptcy Judge.

This case came on for a hearing on April 17, 2002 ("Hearing"), on an application by J.B. Poindexter & Co., Inc. ("J.B. Poindexter"), a creditor, for payment of certain administrative expenses ("Application") (Doc. No. 115) arising from J.B. Poindexter's participation in this case as a potential purchaser of the assets of the debtors, Kidron, Inc., Transportation Technologies, Inc., Hackney & Sons, Inc., and Hackney Brothers, Inc. ("Debtors"). The Application seeks administrative priority status for these expenses on the basis that they were incurred "in making a substantial contribution" to this chapter 11 case and thus are entitled to administrative priority status under 11 U.S.C. section 503(b)(3)(D). Objections to the Application have been filed by the Official Committee of Unsecured Creditors ("Committee") (Doc. No. 124) and Cedar Acquisition Corporation ("Cedar") (Doc. No. 127). Cedar was the successful bidder and purchaser of the assets of the Debtors and is the party responsible for payment of allowed administrative claims under the terms of the plan of reorganization confirmed by the Court in these cases. Cedar is also affiliated with H.I.G. Capital, LLC, the agent for H.I.I.I., Inc., which in turn was the majority shareholder of the Debtors.

For the reasons set forth below, the Court will approve the Application to the limited extent that J.B. Poindexter made a substantial contribution to these cases beyond its role as a mere bidder. However, as to the expenses incurred by J.B. Poindexter not directly related to those efforts but related to its role as an unsuccessful bidder for the Debtors' assets, the Court will not approve the Application.

*Findings of Fact*

During the years leading up to the filing of these chapter 11 cases on December 7, 2001, the Debtors were leading manufacturers of specially designed multi-stop refrigerated trucks (used for food service,

dairy, and produce distribution), as well as emergency vehicles. They conducted business in Independence, Kansas; Lakeland, Florida; Kidron, Ohio; and Washington, North Carolina. The combined operations of the Debtors generated revenues of approximately $100 million in their fiscal year 1999. In their fiscal year 2000, the Debtors' revenues declined to approximately $80 million. Revenues continued to decline until and after the chapter 11 filing.

Bank of America ("BofA") was owed approximately $23,182,000 on the petition date and was the Debtors' largest creditor. The amount owed to BofA was secured by a lien on all of the Debtors' assets. The Debtors also owed general unsecured creditors approximately $12.6 million.

Immediately after the filing of these cases, the Debtors filed a motion requesting an order granting them the use of cash collateral. An emergency hearing was held on December 12, 2001, to consider the Debtors' request. BofA opposed the Debtors' use of cash collateral. In this regard, there was a significant issue presented to the Court at that time as to whether the Debtors could ever provide adequate protection to BofA for the Debtors' continued use of cash collateral because the Debtors' projections reflected that they were losing approximately $1 million per month. Accordingly, while the Court overruled BofA's initial objections to the use of cash collateral for operations in the four-week period following the Petition Date, the Court directed the Debtors to demonstrate their plan for protecting BofA's cash collateral at a continued hearing scheduled for early January.

On January 2, 2002, the Debtors filed a motion to sell all of their assets pursuant to Bankruptcy Code section 363 ("Sale Motion") to Cedar for $8.5 million plus assumption of certain priority claims. Con-temporaneously with the filing of the Sale Motion, the Debtors filed a motion seeking an order approving certain procedures with respect to the proposed sale ("Sale Procedures Motion"). The relief requested in the Sale Procedures Motion included a request for approval of a $250,000 "break-up fee" ("Break–Up Fee") to be paid to Cedar in the event that the assets of the Debtors were sold to a competing bidder at an auction to be conducted on January 31, 2002.

Because of the inability of the Debtors to adequately protect the continued deterioration of BofA's cash collateral due to losses that were being incurred at the rate of $250,000 per week, matters proceeded on a very compressed timeframe. The continued hearing on the motion to use cash collateral was held on January 11, 2002. At that hearing, the various parties were not in agreement concerning the terms of the proposed sale. However, as a result of negotiations that were conducted over the following week, as announced at a hearing held on January 17, 2002, the Debtors, the Committee, and BofA had reached a consensus on the terms of the sale and the division of proceeds. Specifically, the sale transaction was restructured to increase the consideration paid by Cedar by $2.5 million and to provide various carve-outs and contributions by interested parties that would yield over $1 million for payment of priority and unsecured claims. The agreement also provided that the Debtors' assets would be sold at auction on January 31st with any increase in sale proceeds over the new $11 million initial offer by Cedar to be shared in the proportion of 75 percent to BofA and 25 percent to the general unsecured creditors. In addition, BofA agreed to waive its deficiency claim of approximately $12 million.

However, there was general opposition by the creditors to payment of the Break–

Up Fee to Cedar because of Cedar's relationship to the Debtors. As a result of negotiations among the Debtors, the Committee, and BofA, the Break–Up Fee to be paid to Cedar (in the event the Debtors' assets were sold to a higher bidder) was limited to its reasonable costs and fees not to exceed $100,000.

There were a number of hearings held on a variety of matters leading up to the successful conclusion of the sale on January 31, 2002. At these hearings, beginning with the continued motion on use of cash collateral on January 11th, concerns were voiced by parties in interest that due to the close affiliation between the Debtors and Cedar as the "stalking horse" proposed purchaser for the Debtors' assets, the Debtors were not cooperating with other parties interested in obtaining financial information in order to make competing bids for the Debtors' assets.[1] This led the Court to voice similar concerns at the same hearing about a sale being conducted by "either insiders or quasi-insiders" and the ability of parties to engage in effective due diligence.[2] While the Debtors disputed doing anything to frustrate other bidders,[3] this theme of non-cooperation regarding competitors' due diligence continued in subsequent hearings.

For example, at the next hearing, on January 17th, at which the sale to Cedar was approved (subject to higher bids), the U.S. Trustee again complained of the Debtors' alleged refusal to make documents available to competing bidders.[4]

Potential bidders again complained and expressed "frustration" that the Debtors' actions were not consistent with maintaining a "level playing field."[5] J.B. Poindexter, echoing these complaints, stated that the Debtors and Cedar had "effectively put a stranglehold on anyone else's attempt to get information to compete with a bid."[6] Relevant to the Application, J.B. Poindexter made specific suggestions on how due diligence information could be made immediately available so that it and other interested bidders could react and make a decision within the compressed timeframe on which matters were proceeding.[7] As a result of these specific suggestions, the Court directed at the conclusion of the January 17th hearing certain items to be produced, a timetable for such production, and specifics as to the level of required cooperation by the Debtors.[8]

On January 24, 2002, J.B. Poindexter acquired an unsecured claim from a creditor of the Debtors. On that date, the Debtor filed an emergency motion for protective order with respect to requests for information by J.B. Poindexter and one other potential bidder, which information the Debtors contended would jeopardize their going concern value. Matters were resolved successfully at a hearing held the next day, Friday, January 25th, with the Debtors agreeing to provide additional information. J.B. Poindexter participated at that hearing through local counsel and, telephonically, Houston counsel.

---

1. Transcript of hearing of January 11, 2002 ("Jan. 11 Hrg. Trans.") at 29 (concerns expressed by Committee), 33 (concerns expressed by U.S. Trustee), and 35–37 (concerns expressed by a competing bidder).

2. *Id.* at 52–53.

3. *Id.* at 50.

4. Transcript of hearing of January 17, 2002 ("Jan. 17 Hrg. Trans.") at 33–34.

5. *Id.* at 39–40.

6. *Id.* at 51–56.

7. *Id.* at 51–60.

8. *Id.* at 108–109.

A previously scheduled hearing was held on Monday, January 28th, to consider any objections to the Sale. All objections having been resolved, it appeared that matters were proceeding forward to the scheduled auction to be held on January 31st. Despite these initial appearances, however, disputes continued to arise as to due diligence and sale-related issues. On January 30th, J.B. Poindexter filed a motion to resolve these pre-auction issues. Specifically, the motion raised two issues. First, it appeared that the Debtors had taken the position that J.B. Poindexter, having submitted an initial competing bid through a subsidiary within the time prescribed by prior order of the Court, was not a qualified bidder. The second issue related to the amount of administrative expenses to be assumed as part of the sale.

In order for a successful auction to take place the following day, it was clear to the Court that these were crucial issues that needed to be resolved. Accordingly, the Court conducted a hearing at 8:30 a.m. on January 31st. At the hearing it was determined that J.B. Poindexter, through its subsidiary, was a qualified bidder. Second, it was concluded that any bidder would assume all administrative and priority expenses. In order to allow J.B. Poindexter to do further due diligence as to the extent of possible administrative and priority claims, representatives of the Debtors were ordered to submit to depositions by J.B. Poindexter immediately following the morning hearing. The depositions were successfully concluded, enabling the auction to be conducted immediately thereafter.

The amount bid by Cedar in order to out-bid J.B. Poindexter's final bid, was $13 million, $2 million more than the $11 million it had previously agreed to pay. Under the terms of the Sale Order, this additional amount was allocated $1.5 million to BofA and $500,000 to the holders of unsecured claims.

Poindexter incurred $251,546.77 in actual expenses and costs in connection with its participation in this case. ("J.B. Poindexter Expenses"). Of this amount, $85,816.09 was for the legal fees, appraisal costs, and audit expenses incurred by the lender that had committed to provide financing to J.B. Poindexter in connection with its purchase of the Debtors' assets ("Financing Expenses"). Another $5,614.73 was incurred for local counsel opinion letters to be provided to the lender at closing ("Closing Expenses"). Expenses for travel and lodging of various officers and employees for due diligence of the Debtors' books and records at various locations amounted to $16,455.79 ("Due Diligence Expenses"). J.B. Poindexter also incurred legal fees for its general outside counsel in Houston in the amount of $123,235.16 ("General Counsel Fees") and for local bankruptcy counsel of $11,525.00 ("Local Bankruptcy Counsel Fees"). Of the $251,546.77 of total expenses incurred, $203,868.32 was incurred after J.B. Poindexter acquired the claim giving it the status of a creditor. It is for this latter amount that J.B. Poindexter requests reimbursement as an administrative expense under Bankruptcy Code section 503(b)(3)(D).

### Issue

The issue before the Court is whether the J.B. Poindexter Expenses were incurred by it as a creditor making a substantial contribution in the Debtors' chapter 11 cases. For the reasons set forth below, the Court concludes that as a general proposition, expenses incurred by a creditor with respect to merely participating as a bidder in the purchase of a debtor's assets in a chapter 11 case are not "incurred by a creditor in making a sub-

stantial contribution" to a chapter 11 case, even if the sale proceeds increased as a result of bids made by the creditor. However, to the extent expenses are incurred—which, although incurred in conjunction with a creditor's participation in the purchase of a debtor's assets—also directly, materially, and demonstrably contribute to the process of achieving a successful sale for the benefit of creditors generally, then such expenses should be allowed as administrative expenses under section 503(b)(3)(D).

### Conclusions of Law

The Court has jurisdiction over this matter pursuant to 28 U.S.C. sections 1334(b), 157(b)(1) and (2). This is a core proceeding in accordance with 28 U.S.C. section 157(b)(2)(A), (B), (N), and (O).

The Committee and Cedar (as the successful bidder now responsible for administrative expenses) oppose the Application arguing that J.B. Poindexter is now seeking approval of a "break-up fee as a disappointed bidder, after the fact." Cedar's Opposition ¶ 14; see also Committee's Opposition ¶ 10. As argued by Cedar, "The bidding procedures established by this Court anointed Cedar as the stalking horse, entitled to receive an expenses reimbursement of $100,000." Id. Indeed, there is a certain logic to the proposition that absent a pre-approved break-up fee, expenses incurred by unsuccessful bidders, even where the assets realize more because of their bids, should not, as a general proposition, be accorded administrative priority under section 503(b)(3)(D). Taken to its absurd extreme, such sales would serve to fund the expenses of all of the unsuccessful bidders and leave nothing for creditors.

To accept the Committee and Cedar's position, however, would be tantamount to adopting a per se rule that unsuccessful bidders are never entitled to recover fees under section 503(b)(3)(D) unless their legal entitlement to such compensation is established by an appropriate motion prior to the auction bidding process. Committee's Opposition ¶ 10; Cedar's Opposition ¶ 14.

■ In support of its position, the Committee relies on a line of cases that stand for the proposition that when a creditor is "pursuing its own economic self-interest, as by definition it does as a bidder at a bankruptcy auction, then that creditor cannot establish the requisite 'direct benefit' which the case law requires in order to grant a creditor a section 503(b) award." Committee Objection at ¶ 9 (citing In re Public Service Co. of New Hampshire, 160 B.R. 404, 452 (Bankr.D.N.H.1993)). In this regard, the court in Public Service of New Hampshire cited to the Tenth Circuit case of In re Lister, 846 F.2d 55, 57 (10th Cir.1988) for the general conclusion that "[e]fforts undertaken by a creditor solely to further his own self-interest ... will not be compensable, notwithstanding any incidental benefit accruing to the bankruptcy estate." In re Lister, 846 F.2d 55, 57 (10th Cir.1988).

While there is a certain simplistic appeal to the arguments advanced by the Committee and Cedar, these arguments ignore both the precedent and the reasoning of the Eleventh Circuit case of In re Celotex, 227 F.3d 1336 (11th Cir.2000) and the legal analysis and authorities upon which it relies. In Celotex, the Eleventh Circuit noted that a conflict has developed among the circuits regarding whether the motivation behind a creditor's actions should disqualify the creditor from receiving fees where a contribution has been made to the resolution of the bankruptcy proceeding. Id. at 1338.

One line of cases looks to the plain language of section 503(b)(3)(D) which by its terms in no way references a requirement of "a self-deprecating, altruistic intent as a prerequisite to recovery . . . ." *Id.* (quoting *In re DP Partners, Ltd.*, 106 F.3d 667, 673 (5th Cir.1997)). As noted previously, the other line of cases, relied upon by the Committee, holds the opposite. *See, e.g., In re Lister*, 846 F.2d 55, 57 (10th Cir.1988). In considering this conflict of authority, the Eleventh Circuit rejected the approach taken in *Lister* noting that "it is difficult to imagine a circumstance in which a creditor will not be motivated by self-interest in a bankruptcy proceeding," and adopted the approach taken by the Fifth Circuit in *DP Partners*. *Celotex*, 227 F.3d at 1338. "We find the logic of the Fifth Circuit, as stated in *DP Partners*, compelling." *Id.* Indeed, this Court cannot recall a single instance of a creditor in any case acting altruistically and without any self-interest but solely for the benefit of the estate. To require such an intent would limit the scope of section 503(b)(3)(D) to such narrow and unrealistic circumstances so as to render it meaningless.

In *DP Partners*, Hall Financial, a party interested in acquiring the debtor's assets, recognized that the plan of reorganization proposed by the debtor undervalued the debtor's holdings. To facilitate its objective of acquiring the debtor's assets, Hall Financial purchased three small unsecured claims and thus became a creditor. *DP Partners* at 667. Thereafter, in its capacity as a creditor of the debtor, Hall Financial proposed a competing plan thereby "setting off a bidding war." *Id.* Hall Financial was unsuccessful in its attempt to acquire the debtor's assets, but due in large part to its participation in the case, the plan that was ultimately confirmed provided $3 million more to creditors than the plan originally proposed by the debtor.

*Id.* Thereafter, Hall Financial sought to recover approximately $150,700 in fees incurred in this unsuccessful effort.

 After considering this request, the Fifth Circuit in *DP Partners* focused on the plain language of section 503 which provides in pertinent part, that "[a]fter notice and a hearing, there shall be allowed administrative expenses" for entities falling into certain categories. 11 U.S.C. section 503(b). There is no mention whatsoever in this provision that a court should consider the creditor's motivations in determining whether or not a creditor is entitled to have its expenses reimbursed. The courts following the approach taken by the Fifth Circuit in *DP Partners* simply adhere to the basic principle that the "starting point for . . . interpretation of a statute is always its language." *In re Yates Development, Inc.*, 256 F.3d 1285, 1288–89 (11th Cir.2001) (citing to Supreme Court precedents and other 11th Circuit cases). Moreover, use of the word "shall" connotes a mandatory intent. *Celotex*, 227 F.3d at 1338 (*citing Sierra Club v. Train*, 557 F.2d 485 (5th Cir.1977)).

Accordingly, it is clear to this Court that irrespective of the creditor's motivation for its participation in a case, if such participation makes a "substantial contribution" to the case, then the creditor's expenses, including attorneys' fees, must be provided administrative priority under section 503(b)(3)(D) and (b)(4).

Importantly, by its own terms, such an award is predicated on the contribution being "substantial." This term is not defined in the Bankruptcy Code. It is clear, however, that the courts that have analyzed what kinds of contribution will be considered "substantial" have generally concluded that creditors' actions that "incidentally" benefit the estate are not "substantial" for purposes of section

503(b)(3)(D). Rather, the courts have required a showing that the creditors' actions must: (1) "directly and demonstrably benefit" the estate, *Lebron v. Mechem Fin., Inc.,* 27 F.3d 937 (3d Cir.1994); (2) "foster and enhance, rather than retard or interrupt the progress of reorganization," *Celotex* at 1338 (*quoting In re Consolidated Bancshares, Inc.,* 785 F.2d 1249, 1253 (5th Cir.1986)); and (3) be "considerable in amount, value or worth." *DP Partners* at 672 (citing *Webster's Third New International Dictionary* 2280 (4th Ed.1976)).

Viewed in this context, the inquiry to be made by a court under these circumstances must focus on the precise nature of the services rendered. Expenses that are typical and ordinarily incurred by purchasers of assets in performing due diligence, participating as a buyer in connection with a sale procedures motion and a motion to approve a sale, obtaining financing, and participating as a bidder in the auction, will not ordinarily be entitled to administrative priority under section 503(b)(3)(D) because of its incidental benefits to the estate. However, where special or unusual circumstances are present and the unsuccessful bidder directly contributes to the sales process as necessitated by circumstances resulting in a demonstrable benefit to the estate, then such expenses should be allowed as administrative expenses under section 503(b)(3)(D).

In this case, the Court concludes that special and unusual circumstances existed due to the connection between the "stalking horse" bidder and the Debtors, which relationship, in light of the compressed timeframe in which the sale occurred, appears to have initially hampered the flow of due diligence information to interested bidders for the Debtors' assets. These circumstances required extraordinary efforts by J.B. Poindexter to even the "playing field" so that an auction could

proceed. The result of these efforts fostered and enhanced the sale of the Debtors' assets for an amount exceeding the Cedar bid by $2 million.

Turning to J.B. Poindexter's expenses incurred after it had obtained the status of a creditor, the Court must determine which of these expenses fall into the extraordinary category to be entitled to administrative priority under section 503(b)(3)(D). In this regard, as set forth above, the expenses fall into five categories: Financing Expenses of $85,816.09, Closing Expenses of $5,614.73, Due Diligence Expenses of $16,455.79, General Counsel Fees of $123,235.16, and Local Bankruptcy Counsel Fees of $11,525.00.

Upon review of these expenses, the Court concludes that none of the Financing Expenses, Closing Expenses, or Due Diligence Expenses rise to the level of "directly and demonstrably" benefiting the estate so as to give rise to an administrative claim under section 503(b)(3)(D). These expenses are typical of those incurred by buyers involved in section 363 purchases in similar cases and can provide only incidental, if any, benefit to the estate and its creditors. With respect to General Counsel Fees and Local Bankruptcy Counsel Fees incurred specifically in connection with actions directed at facilitating the flow of due diligence information to even the "playing field" and concluding the auction with the active participation of any interested bidders, however, the Court concludes that to the extent that such fees were "considerable in amount, value or worth" in "foster[ing] and enhanc[ing]" the ability of the Debtors to conduct a fair and open auction resulting in a demonstrable benefit to the estate, such fees are entitled to administrative priority under section 503(b)(3)(D).

After a review of the detailed time entries that accompanied the Application with respect to General Counsel Fees and

Local Bankruptcy Counsel Fees, it is the Court's conclusion that $11,418.51 of the General Counsel Fees and $7,758.03 of the Local Bankruptcy Counsel Fees fall within this category and thus within the scope of section 503(b)(3)(D).

The Court notes that J.B. Poindexter's suggested solutions to keep the auction process moving at an accelerated pace were adopted by the Court at the January 17th hearing. While the expenses incurred by J.B. Poindexter prior to January 24th when it became a creditor are not compensable, these efforts continued up until the day of auction and substantially benefited the process of holding a fair and open auction of the Debtors' assets. Certain portions of the time expended from and after January 24th (the date on which J.B. Poindexter acquired its claim), particularly with respect to the hearings held on January 25th, 28th, and January 31st at which J.B. Poindexter meaningfully participated, resulted in interested bidders gaining access to due diligence information with the result that a successful auction was concluded on January 31st. J.B. Poindexter's efforts were necessitated by the unusual circumstances relating to the close relationship between Cedar and the Debtors, as well as the Debtors' dire financial condition which caused the compressed timeframe for the sale. Such expenses were of an extraordinary nature as necessitated by these special circumstances and resulted in a direct and demonstrable benefit to the estates in these cases.

### Conclusion

As a general proposition, expenses incurred by a creditor with respect to participating in the purchase of a chapter 11 debtor's assets are not "incurred by a creditor in making a substantial contribution" to a chapter 11 case within the meaning of section 503(b)(3)(D). Creditors' actions that may benefit the estate are not substantial for purposes of this section un-

less they also directly, materially, and demonstrably benefit the creditors generally, foster and enhance, rather than retard or interrupt the progress of reorganization, and are considerable in amount, value, or worth.

Although the majority of the J.B. Poindexter Expenses in this case were of the type ordinarily incurred by a prospective purchaser of a chapter 11 debtor's assets, because of the situation presented by the compressed timeframe required under the circumstances, and the close relationship between the "stalking horse" bidder and the Debtors in this case, it is appropriate to allow certain of the expenses incurred in "leveling the playing field" as administrative expenses incurred by a creditor in making a substantial contribution to the case under section 503(b)(3)(D).

Accordingly, for these reasons, it is

ORDERED:

1. The Application is approved to the extent set forth above.

2. J.B. Poindexter shall be entitled to an administrative claim under section 503(b)(3)(D) in the amount of $19,176.54.