**In the Matter of THE NEW POWER COMPANY, a/k/a EMW Marketing Corp., a/k/a Columbia Energy Services, New Power Holdings, Inc., a/k/a EMW Energy Services Corp., a/k/a TNPC, Inc., TNPC Holdings, Inc., a/k/a EMW Holdings Corp., Debtors.**

Nos. 02–10835–WHD through 02–10837–WHD.

United States Bankruptcy Court, N.D. Georgia, Newnan Division.

May 24, 2004.

Rob Williamson, Scroggins & Williamson, Atlanta, GA, Paul A. Rubin, Herrick, Feinstein, LLP, New York, NY, for Riverside Contracting, LLC.

Richard W. Havel, Sidley Austin Brown & Wood LLP, Los Angeles, CA, Paul K. Ferdinands, King & Spalding, Atlanta, GA, Geoffrey T. Raicht, Sidley Austin Brown & Wood LLP, New York City, for Debtors.

James C. Cifelli, Lamberth, Cifelli, Stokes & Stout, P.A., Atlanta, GA, for Enron Creditors.

## ORDER

W. HOMER DRAKE, JR., Bankruptcy Judge.

Before the Court is the Application for Payment of Legal Fees and Costs filed by Riverside Contracting, LLC (hereinafter "Riverside") in the above-captioned bankruptcy proceeding. Objections to the Application have been filed by New Power Company, NewPower Holdings, Inc., and TNPC Holdings, Inc. (collectively referred to herein as the "Debtors") and Enron Corp., Enron North America Corp., Enron Power Marketing, Inc., and Enron Energy Services, Inc. (collectively referred to as "Enron"). Carlson Capital has filed a letter in support of the Application. This matter constitutes a core proceeding over which this Court has subject matter jurisdiction. *See* 28 U.S.C §§ 157(b)(2)(B); 1334.

### BACKGROUND

On June 11, 2002, the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code. These cases were administratively consolidated on June 12, 2002, and an Official Committee of Unsecured Creditors (hereinafter the "Committee") was appointed for the New Power Company (hereinafter "New Power") on June 18, 2002.

New Power is the operating entity through which the Debtors provided gas and electric service to customers in various states, including Georgia, Texas, Ohio, and Pennsylvania. New Power is a wholly owned subsidiary of TNPC Holdings, Inc. (hereinafter "TNPC"), which, in turn, is a wholly owned subsidiary of NewPower Holdings, Inc. (hereinafter "Holdings"), a publicly traded corporation. Enron holds 13,650,400 shares of the outstanding common stock of Holdings and warrants exercisable for an additional 42,134,200 shares. At the time the cases were filed, Enron also held a $28 million secured claim (hereinafter the "Enron Lien"), which arose from the settlement of a series of commodity purchases and swap transactions between Enron and the Debtors.

Throughout the case, the Debtors have continued to operate as debtors-in-possession and have worked toward the liquidation of the Debtors' assets. The asset sales, the bulk of which were concluded prior to the end of July 2002, produced funds sufficient to pay all creditors in full with interest. Despite the early assurances of the Debtors that the asset sales

would be sufficient to pay all unsecured claims, the Committee insisted upon the preservation of its right to investigate and contest the validity of the Enron Lien. On November 4, 2002, following the conclusion of the Committee's investigation, the Debtor paid substantially all of Enron's secured claim.

The Debtors filed a disclosure statement and proposed Chapter 11 plan on October 8, 2002. This plan anticipated payment of the unsecured creditors of New Power, with the balance of the funds being transferred to TNPC, and, in turn to Holdings, in satisfaction of intercompany debts. The unsecured creditors of Holdings would then be paid, and the remaining funds would be used to pay subordinated claims, including claims arising from certain securities fraud litigation filed against the Debtors (hereinafter the "Class 8 Litigation"), and make a distribution to equity holders.

On October 24, 2002, Riverside, a minority shareholder of Holdings, formally requested that the United States Trustee (hereinafter the "UST") appoint a committee of equity securities holders. The UST declined to appoint an equity committee, but informed Riverside on November 15, 2002, of his intent to move for the appointment of an examiner. Prior to Riverside's request, the Committee had approached the UST about the need for the appointment of an examiner to investigate and possibly object to insider claims filed in the Holdings case. [Transcript of Proceedings Held on December 17, 2002, at 11]. The UST's motion for appointment of an examiner was filed on December 2, 2002, and stated that, although the UST was not aware of any allegations of fraud or mismanagement, it would be appropriate for an examiner to investigate the substantial number of insider claims that had been filed in the Debtors' cases.

Dissatisfied with the UST's approach, Riverside filed a motion seeking the appointment of an equity committee on November 26, 2002. In its motion, Riverside noted that, following the final liquidation of the Debtors' assets and payment of all creditors' claims, millions of dollars would be available for distribution to the shareholders of Holdings, and accordingly, Riverside believed that a committee should be formed to protect the shareholders' interests. Of primary concern to Riverside was the fact that the Committee had ceased investigating the Enron Lien, clearing the way for the Debtors to pay Enron's claim in full, and that the UST did not intend to seek authority for the examiner to investigate the Enron Lien. [Riverside's Motion for Appointment of Committee of Equity Securities Holders, November 26, 2002; Riverside's Objection to Motion by the UST for Appointment of an Examiner for Limited Purposes, December 13, 2002].

The Debtors and the Committee supported the appointment of an examiner, but were opposed to the appointment of an equity committee. [Debtors' Objection to Motion for Appointment of Committee of Equity Security Holders, December 16, 2002; Committee's Objection to Motion for the Appointment of Committee of Equity Security Holders, December 13, 2002]. Enron also objected to Riverside's motion and filed a limited objection to the UST's motion, objecting to the appointment of an examiner to the extent that the examiner would be authorized to further investigate either the Enron Lien or Enron's equity interests in Holdings. [Enron's Limited Objection to the UST's Motion for Appointment of Examiner, December 13, 2002; Enron's Objection to Motion for Appointment of Equity Security Holders, December 16, 2002]. Carlson Capital supported Riverside's motion.

[Joinder Motion for Appointment of Equity Committee, December 16, 2002].

During the hearing held on December 17, 2002 on both motions, Riverside argued that, in the event the Court appointed an examiner rather than an equity committee, the Court should grant the examiner expanded powers that would allow the examiner to investigate and object to insider claims, including those held by Enron. At the conclusion of the hearing, the Court denied Riverside's motion and granted the motion to appoint an examiner, but reserved ruling on the extent of the examiner's duties and powers. [Transcript of Proceedings Held on December 17, 2002, at 51]. The Court's subsequent order authorized the examiner to "investigate, file reports, and take any appropriate action with respect to": 1) "[w]hether any claim asserted by [Enron] should be recharacterized as equity"; 2) "[w]hether the [equity interests] of [Enron] are valid"; 3) whether the claims of insiders (other than Enron) or non-insiders who are or were officers, directors, or employees of the Debtors should be allowed; and 4) whether claims in Class 8 should be allowed.[1] [Order Granting Motion to Appoint Examiner, January 13, 2003 (hereinafter the "Examiner Order") ].

Also before the Court at the December 17th hearing was the approval of the Debtors' disclosure statement. Riverside had previously filed an objection to the disclosure statement, in which it argued that the disclosure statement hearing should be adjourned pending the Court's ruling on the appointment of an examiner and/or an equity committee and that the disclosure statement did not contain adequate information about insider claims and potential avoidance actions. [Riverside's Objection to Approval of Debtors' Disclosure Statement, December 9, 2002]. Because it was filed prior to the filing of Riverside's motion, the original disclosure statement contained no discussion of the possibility of the appointment of an equity committee or an examiner. The Debtor's amended disclosure statement, which was filed with the Court on December 19, 2002, was circulated prior to the hearing and indicated that the Debtors intended to include a discussion of the Court's order regarding the examiner. [Transcript of Proceedings Held on December 17, 2002, at 54, 57].

During the hearing, Riverside argued that the disclosure statement should contain a more detailed discussion of the examiner's role in the case. Riverside also expressed concern that the Debtors' Plan, as originally filed, contained provisions that would eliminate the examiner's right to investigate claims upon confirmation. [Transcript of Proceedings Held on December 17, 2002, at 61]. Riverside specifically pointed out that Section 5.1 of the Plan stated that "All Claims litigation and all avoidance actions vest with the debtor." [Id. at 62]. Riverside interpreted this provision as one that would grant the Debtors the "sole and exclusive ability to pursue claims litigation and avoidance actions, obviously at least with respect to insider claims," and therefore, believed that confirmation of the Plan would divest the examiner of any power to conduct an investigation or take any action with regard to objectionable claims. [Id.]. Following the December 17th hearing, the Court ap-

---

1. The parties submitted for the Court's consideration different versions of proposed orders and filed statements in support of their respective orders. [Riverside's Statement in Support of Proposed Order on Motion for Appointment of Examiner, January 6, 2003; Statement in Support of Enron Creditors' Proposed Order Authorizing the Appointment of Examiner, January 8, 2003; Debtors' Objection to Proposed Orders Appointing Examiner, January 3, 2003].

proved the Debtors' amended disclosure statement. [Order Approving Debtors' Disclosure Statement, December 20, 2002]. As to the role of the examiner, the amended disclosure statement explained that the Court had granted the motion to appoint an examiner and that an order would be entered that would "authorize the examiner (among other things) to investigate, file a report and take other appropriate actions with respect to … [w]hether any claim asserted by [Enron] should be recharacterized as equity" and "[w]hether [Enron's] Interests in Class 9 and Class 11 are valid." [Debtors' Amended Disclosure Statement, December 19, 2002, at 21–22]. Along with the amended disclosure statement, the Debtors served the First Amended Chapter 11 Plan (hereinafter the "First Amended Plan"), which was filed with the Court on December 23, 2002. Section 5.11 of the First Amended Plan continued to provide that "[a]ll Claims Litigation or any objection to Claim will be conducted by the Debtors, and all Avoidance Actions will vest with the Debtors." [First Amended Plan, Section 5.11]. Additionally, the First Amended Plan contained no provisions regarding the examiner. However, the Second Amended Plan, which the Debtors filed on February 12, 2003, was modified to provide that the Debtors would conduct all claims litigation, with the exception of those matters that would fall within the duties of the examiner, as provided in Section 12.1. [Second Amended Plan, Section 5.11]. Section 12.1 contained language that clarified that nothing in the Plan was intended to limit the powers of the examiner as provided by the Examiner Order. [Second Amended Plan, Section 12.1].

Following the filing of the Second Amended Plan, the Court conducted a confirmation hearing on February 12, 2003, at which time the Court orally confirmed the Second Amended Plan of New Power, but deferred ruling on confirmation of the Second Amended Plan of Holdings and TNPC. [Transcript of Proceedings Held on February 12, 2003, at 76]. The order confirming the Second Amended Plan of New Power was entered on February 28, 2003. Enron filed a written objection to confirmation of the plans of Holdings and TNPC on February 27, 2003, and the Court held continued hearings on confirmation on February 28, 2003 and April 4, 2003. At the April 4th hearing, the Court also heard arguments on Enron's Motion for Reconsideration of the Confirmation of the Second Amended Plan of New Power, which was filed on March 7, 2003. Following the hearing, the Court took all of those matters under advisement. On July 11, 2003, the Court entered an order denying Enron's Motion for Reconsideration and overruling Enron's objections to confirmation of the plans of Holdings and TNPC. Enron filed its notice of appeal as to this ruling on July 21, 2003. The appeal is currently pending before the United States District Court for the Northern District of Georgia, Newnan Division.

In accordance with the Examiner Order, the UST appointed Rufus T. Dorsey (hereinafter the "Examiner") as examiner in the TNPC and Holdings cases. The Court approved the UST's appointment on January 17, 2003. The Examiner filed his initial report on February 19, 2003. Since that time, the Examiner has engaged in several negotiations regarding the claims of insiders. These negotiations have resulted in settlements, which have been approved by the Court and have brought value to the estate by way of reductions in the amount of claims filed in the case. Specifically, the Examiner's efforts have reduced the allowed claims in this case by approximately $15 million.

### CONCLUSIONS OF LAW

As the Debtors have noted, as a general rule, each party to a litigation

must pay its own fees and expenses. However, in the bankruptcy context, if a creditor or other party makes a substantial contribution to a bankruptcy case, the Code provides for payment of the party's expenses as an administrative expense by the estate. *See* 11 U.S.C. 503(b)(3)(D); *Matter of D'Lites of America, Inc.,* 108 B.R. 352 (Bankr.N.D.Ga.1989) (Drake, J.). The party seeking payment of an administrative expense claim under § 503(b)(3)(D) bears the burden of proving that the "expenses resulted in a significant and tangible benefit to the estate." *D'Lites,* 108 B.R. at 356. The simple fact that the expenses were incurred, without proof of a "concrete benefit to the estate" is insufficient to satisfy this burden. *Id.* The Court will not allow the payment of expenses if it concludes that the claimant's participation in the case "as a whole was detrimental to the estate," or "caused an adverse impact on the estate rather than a 'substantial contribution' as required by § 503(b)(3)(D)." *Id.* For example, notwithstanding a finding of extensive involvement in a case, the Court is unlikely to find a substantial contribution when the movant's participation has retarded or interrupted the debtor's reorganization. *See In re DP Partnership,* 106 F.3d 667, 672 (5th Cir.1997); *In re Communications Management & Information, Inc.,* 172 B.R. 136, 141 (Bankr.N.D.Ga.1994) (Murphy, J.); *see also In re Big Rivers Elec. Corp.,* 233 B.R. 739 (W.D.Ky.1998) (denying application for payment of expenses after finding that, although some of the applicant's activities may have benefitted the estate, any benefit was outweighed by the costs associated with the applicant's attempts to interrupt and delay the bankruptcy proceedings).

■ The Court recognizes that "the motive of the petitioner should not be a factor in determining whether a substantial contribution has been made in the bankruptcy proceeding." *In re Celotex Corp.,* 227 F.3d 1336, 1339 (11th Cir.2000). Accordingly, the fact that the movant performed services or incurred expenses primarily to benefit its own interest rather than that of the estate or the creditors at large is irrelevant to the question of whether the movant has made a substantial contribution to the case. Nonetheless, when a creditor acts primarily for its own benefit, the evidence may show that the movant's participation resulted in a primary benefit to the creditor and only an incidental benefit to the estate. In such a case, the contribution made is not "substantial" within the meaning of the statute. *In re Kidron, Inc.,* 278 B.R. 626 (Bankr. M.D.Fla.2002).

■ As a threshold matter, the Court recognizes that the Examiner has brought significant value to these bankruptcy estates. The Examiner's investigation of insider claims and subsequent negotiations with the claimants have resulted in a gain of at least $15 million for the equity holders. The Examiner has also undertaken an extensive examination of claims held by Enron. It remains to be seen whether this investigation will produce a net benefit to the Debtors' estates. The Court also acknowledges that Riverside has participated extensively in these bankruptcy cases. However, the question is whether Riverside's participation brought about the Examiner's success and contributions to the estate.

■ Having considered the record in this case, the Court must conclude that the Examiner would have been appointed for the purpose of examining insider claims absent Riverside's insistence on the appointment of an equity committee. Statements made by counsel to the Committee support the Court's conclusion that the Committee, either before or contempora-

neously with Riverside's request for an equity committee, had voiced its concern to the UST about the fact that the Committee had no interest in investigating insider claims that had been filed against Holdings.[2] Additionally, the Debtors supported the Committee's request that the UST appoint an examiner for the purpose of investigating the insider claims. Riverside's activities with regard to these claims were duplicative and may have been completely unnecessary. As the Debtors have pointed out, "[s]ervices that duplicate those rendered by the debtor or other court appointed officers, absent proof that they are unwilling or unable to act, are not compensable because they entail an excessive and undue burden on the estate." *In re Granite Partners, L.P.*, 213 B.R. 440, 446 (Bankr.S.D.N.Y.1997). In short, the Court does not believe that the estate should bear the burden of paying the fees incurred by the Committee and Riverside to obtain the same results. Furthermore, Riverside has not established that the Debtors would not have or could not have objected to the insider claims filed by Holdings and reached similar settlements with these claimants. As the Debtors have pointed out, Riverside raised the issue of whether an equity committee should be appointed at the end of November, less than six months into the Debtors' case. It may be that the Debtor simply did not have sufficient time to conduct its investigation and object to these claims.[3]

Similarly, Riverside contends that it made a substantial contribution to the estates by insisting that the Debtors investigate affirmative claims that the estates may have had against insiders. The Court has reviewed the record and agrees with the Debtors that there is no indication in the record that the Debtors would not have initiated this investigation without Riverside's involvement. At the February 28th hearing, the Court confirmed the Examiner's understanding that his duties did not include investigating these affirmative claims. Subsequently, counsel for Riverside stated that Riverside's only concern was that the Debtors should undertake an investigation of these claims and that Riverside would "take at face value [the Debtors'] indication that they will do so." [Transcript of Proceedings Held February 28, 2003, at 34]. At that point, Riverside also requested that the Court direct the Debtors to prepare a report as to the status of the investigation. *Id.* The Court believes that the Debtors already intended to investigate and pursue any viable claims. Again, Riverside has failed to establish that the Debtors could not or would not investigate and pursue these claims. Accordingly, the Court is not persuaded that Riverside's participation, as to this issue, resulted in any significant benefit to the estates.

However, the Court does agree with Riverside that, absent its participation in these cases, neither the Debtors, the Committee, nor the UST would have pushed to have the Examiner's investigation expanded to include Enron's claims. It is clear to the Court that the Debtors and the UST were satisfied with the investigation performed by the Committee and would not

---

**2.** At a hearing held on December 17, 2002, counsel for the Committee stated that, prior to Riverside's request, the Committee had approached the UST about the need for the appointment of an examiner to investigate and possibly object to insider claims filed in the Holdings case. [Transcript of Proceedings Held on December 17, 2002, at 11].

**3.** According to the docket, the Debtors' first claim objection was not filed until November 7, 2002. Thereafter, the Debtors continued to examine and object to claims, with the Debtors' seventh omnibus claim objection not being filed until February 18, 2004.

have pursued further investigation of Enron's claims.[4] That being said, as noted above, the Examiner's investigation has not reached a point at which the Court can determine whether the investigation will produce a benefit that will outweigh the time and money spent on this endeavor, including the attendant costs associated with the interruption to the Debtors' reorganization efforts. Accordingly, the Court cannot conclude at this time that the fees incurred by Riverside in pushing for an expansion of the Examiner's duties have resulted in a substantial benefit to the estate. The Court will deny the request at this time, without prejudice to Riverside's right to file a second application at a more appropriate time.

■ Riverside also contends that it made a substantial contribution to the Debtors' reorganization by raising certain objections to the Debtors' disclosure statement and plan of reorganization. Specifically, Riverside objected to the Debtors' post-confirmation board of directors on the basis that three of the proposed directors had potential conflicts of interest because their claims were subject to investigation by the Examiner. These individuals eventually resigned from the board, thus mooting Riverside's objection to confirmation. The Court concurs with Enron's observation that Riverside has not established that the resignation of these directors resulted in any tangible benefit to the estate or the reorganization process. The Court finds that the objection had little merit. As the Debtors point out, the extent of Holdings'

post-confirmation activities was to accumulate funds and await the disbursement of those funds in accordance with the Debtors' confirmed plans. The Debtors contend that the real work of the company was conducted by two officers of the company, without the need to confer with the directors. Additionally, the impact of any conflict of interest on the estate would have been ameliorated by the fact that the Examiner, not the Debtors, was tasked with investigating and objecting to the insider claims. Even if Riverside is correct that the estate received some benefit from the resignation of the directors, whatever value was achieved by preventing these directors from serving on Holdings' board is an intangible benefit that cannot be quantified and cannot be considered significant enough to be the basis for a finding that Riverside made a substantial contribution. In any event, such value, if any, was clearly outweighed by the costs incurred by the Debtors in dealing with this objection.[5]

■ Additionally, Riverside points to the objections it raised at the disclosure statement hearing to certain language in the Debtors' plan. Riverside felt that the wording of the original language would limit the Examiner's ability to continue his investigation. Riverside's efforts apparently resulted in modifications to the Debtors' Second Amended Plan to clarify that the terms of the Plan were not intended to supersede the terms of the Examiner Order. In fact, this modification formed one of the grounds for Enron's motion for reconsideration of the confirmation order.[6]

---

4. During a hearing held on February 28, 2003, counsel for the Debtors stated that "[i]t had been the debtors' position and it continues to be the debtors' position that we have looked at these claims to some extent, that we had made some judgments based largely on some practical as well some technical reasons that pursuit of these claims may not be wise."

[Transcript of Proceedings Held on February 28, 2003, at 19].

5. The Debtors estimate that they incurred at least $16,000 in attorneys' fees to address this objection.

6. Enron asserted that the modification to the Second Amended Plan on the eve of the origi-

It is not clear to the Court that the parties would not have made these modifications without Riverside's intervention. Further, the Court questions whether the failure to modify the Plan would have in fact cut off the Examiner's right to pursue these claims, given the existence of the Examiner Order. Nonetheless, the Court finds that it is reasonable to conclude that Riverside's participation in this limited aspect resulted in a tangible benefit to the estate by protecting the Examiner's rights to object to the insider employee claims.

The Court has reviewed the detailed fee statements submitted by Riverside with its application in order to determine whether the fees incurred by Riverside in this regard are reasonable and were actually and necessarily incurred in making this contribution, within the meaning of § 503(b)(3)(D).

> This provision requires the bankruptcy judge to scrutinize claimed expenses for waste and duplication to ensure that expenses were indeed actual and necessary. It also requires the judge to distinguish between expenses incurred in making a substantial contribution to the case and expenses lacking that causal connection, the latter being noncompensable.

*In re DP Partnership*, 106 F.3d 667, 673 (5th Cir.1997).

With this in mind, the Court has determined that a total of 17.4 hours of time billed by Rob Williamson[7] and 16.8 hours of time billed by attorneys at Herrick, Feinstein LLP[8] represent fees that are reasonable and were actually and necessarily incurred in connection with the amendment to Debtors' Second Amended Plan. This time translates to fees of $4,959 paid to Rob Williamson and $5,925 in fees paid to Herrick, Feinstein LLP. Accordingly, the Court will allow payment to Riverside of $10,884 as an administrative expense, pursuant to § 503(b)(3)(D).

### CONCLUSION

Having carefully considered the Application for Payment of Legal Fees and Costs, filed by Riverside Contracting, LLC, the Court hereby holds that the application should be, and hereby is, **GRANTED** in part and **DENIED** in part without prejudice. Riverside shall be entitled to payment of $10,884 as an allowed administrative expense against the Debtors' bankruptcy estates.

It is further **ORDERED** that, pursuant to § 503(a), Riverside may "tardily" file a

---

nal confirmation hearing materially and adversely impacted its interests because the newly added language authorized the Examiner to pursue the action against Enron and that action would not have been possible under the terms of the First Amended Plan. Enron contended that the First Amended Plan provided that avoidance actions would vest solely with the Debtors, and the Debtors had already agreed not to pursue any action with regard to the Enron Lien. By vesting authority in the Examiner to pursue claims objections and avoidance actions, Enron argued, the Second Amended Plan effectively revived the Debtors' rights to challenge Enron's claims. Additionally, Enron contended that, under the First Amended Plan, the Examiner's investigation would have been cut off by

the confirmation of the Plan, but newly added Section 12.1 of the Second Amended Plan provided for the Examiner's investigation to extend beyond confirmation.

7. The time entries for Rob Williamson included in the Court's calculation include the following: 12/4/02 .30 hrs; 12/5/02 1.5 hrs; 12/9/02 1.4 hrs; 12/9/02 .40 hrs; 12/17/02 7.5 hrs; 12/18/02 3.5 hrs; 12/19/02 2.8 hrs.

8. The time entries for Herrick, Feinstein LLL included in the Court's calculation include the following: 12/03/02 7.2 hrs; 12/05/02 2.5 hrs; 12/06/02 2.5 hrs; 12/06/02 .30 hrs; 12/09/02 1.30; 12/17/02 1.2 hrs; and 12/19/04 1.8 hrs.

second application for payment of administrative expenses at such time as additional information becomes available regarding the Examiner's investigation of the claims and interests held by Enron.

**IT IS SO ORDERED.**