**In re AMERICAN PLUMBING & MECHANICAL, INC., et al., Debtors.**

**Nos. 03–55789 to 03–55814.**

United States Bankruptcy Court, W.D. Texas, San Antonio Division.

June 28, 2005.

Berry D. Spears, C. Mark Brannum, Eli O. Columbus, Demetra L. Liggins, J. Frasher Murphy, Winstead Sechrest & Minick P.C., Dallas, TX, Ishaq Kundawala, Cowles & Thompson, Dallas, TX, for American Plumbing & Mechanical, Inc., et al.

Richard W. Brunette, Theodore A. Cohen, David J. McCarty, T. William Opdyke, Sheppard Mullin Richter & Hampton, Los Angeles, CA, for American Plumbing & Mechanical, Inc., et al.

Jeff Bohm, Steve P. Turner, McGinnis Lochridge & Kilgore, LLP, Austin, TX, for Robert Christianson and Lloyd Smith.

John A. Lapinski, Clark & Trevithick, Los Angeles, CA, Robert E. Opera, Winthrop Couchot P.C., Newport Beach, CA, for Robert C. Riley and Charles E. Parker.

## Memorandum Decision on Substantial-Contribution Claims of the Indenture Trustee (U.S. Bank National Association) and of Four Founders of the Debtor

LEIF M. CLARK, Bankruptcy Judge.

The indenture trustee, U.S. Bank National Association (represented by Sheppard Mullin), and four founders of the debtors[1] filed substantial-contribution claims. DOC. # 1868 (indenture trustee), DOC. # 2013 (Christianson and Smith), and DOC. # 2074 (Parks and Richey). The founders and their counsel are Robert Christianson (represented by McGinnis Lochridge & Kilgore), Lloyd Smith (represented by Hughes & Luce), Robert C. Richey (represented by Winthrop Couchot), and Charles E. Parks (represented by Clark & Trevithick). The founders are equity shareholders, and were directors and officers of the debtors at various times. The court heard the indenture trustee's claim on October 28, 2004 and the four founders' claim on March 3, 2005, and took both matters under advisement. After reviewing the exhibits and supplemental briefing, the court DENIES the indenture trustee's substantial-contribution claim and DENIES the four founders' claim.

### Background

AMPAM, the parent debtor, provided residential and commercial plumbing and HVAC (heating, ventilation and air conditioning) contracting, maintenance, and repair services. AMPAM was formed as part of a "roll-up" transaction when it acquired ten regional providers of plumbing and mechanical services. The four founders were officers of some of the acquired regional providers that, for the most part, were family-run businesses.[2] To finance the roll-up, AMPAM issued preferred stock and $125 million in senior subordinated notes (the "Notes"), which was subsequently paid down to about $95 million. As a result of cost overruns on several projects, the financial burden of making interest payments on the Notes and other debts while dealing with negative cash

---

1. As in many Chapter 11 cases, the word "debtors" here refers to several related corporate entities whose bankruptcy cases are jointly administered. *See* Fed. R. Bankr. P. 1015(b).

2. All four founders are on AMPAM's board of directors. Christianson was CEO of Christian Enterprises, Inc. until AMPAM acquired it in 1999. He is now the CEO of AMPAM. Smith was president of Lindy Dennis Industries, which AMPAM acquired in 2000. Parks was CEO and vice-president of Parks Mechanical Construction Corporation, which AMPAM acquired in 1999. Richey is the CEO of two AMPAM subsidiaries (AMPAM RCR Companies and AMPAM Sacremento), and resigned from AMPAM's board during the Chapter 11 cases.

flow, and liquidity pressure from increasing bonding requirements and insurance costs, AMPAM and its subsidiaries filed for Chapter 11. As part of its reorganization strategy, the debtors sold their commercial segments, and the reorganized debtors now focus primarily on residential plumbing– and HVAC-services markets. The reorganized debtors' operations are less centralized, with AMPAM providing limited services for the subsidiaries, who now operate with more autonomy.

**The substantial-contribution statute and the amounts requested**

Section 503(b) allows indenture trustees and equity-security holders an administrative-expense claim if they made a substantial contribution in the Chapter 11 case. It states: "[T]here shall be allowed administrative expenses ... including– (3) the actual, necessary expenses ... incurred by—(D) a creditor, an indenture trustee, an equity security holder, or a committee ... other than a committee appointed under section 1102 ... in making a substantial contribution in a case under chapter 9 or 11 or this title ... (5) reasonable compensation for services rendered by an indenture trustee in making a substantial contribution in a case under chapter 9 or 11 of this title ...." 11 U.S.C. § 503(b)(3)(D), (5).

The indenture trustee and the four founders seek administrative-expense priority for their attorneys' fees and expenses under § 503(b)(4). The indenture trustee requests $136,951.50 in attorney's fees and $3,294.27 in attorney's expenses. The indenture trustee also seeks administrative-expense priority for its trustee fees totaling $58,946.25 under § 503(b)(5). The committee supports the indenture trustee's application. DOC. # 2028. No objections were filed.

The four founders originally requested, in aggregate, $980,530.65 in attorneys' fees and $13,371.86 in expenses. *See* DOCS. # 2013 and 2074. The U.S. Trustee objected to all four founders' applications. DOCS. # 2045 and 2202. The Plan Agent filed a response, stating that it neither objected to nor supported the founders' application. DOC. # 2033. Wells Fargo, as agent for the senior lenders, objected to Christianson and Smith's application. DOC. # 2043. To resolve Wells Fargo's objection, the four founders agreed to reduce their total substantial-contribution claim to $400,000.00. DOC. # 2193. In return, Wells Fargo withdrew its objection to Christianson and Smith's application, and agreed not to file an objection to Parks' and Richey's application. *Id.*

None of the applicants seek payment of expenses other than fees and expenses incurred by their attorneys. That raises a preliminary problem that none of the applicants addressed.

**May an applicant recover attorneys' fees and expenses under section 503(b)(4) without incurring separate expenses that are allowable under section 503(b)(3)?**

A literal reading of § 503(b) prevents the applicants from recovering their attorneys' fees and expenses under § 503(b)(4) if they did not incur allowable separate expenses under § 503(b)(3). Section 503(b)(4) states that "there shall be allowed administrative expenses ... including ... (4) reasonable compensation for professional services rendered by an attorney ... *of an entity whose expense is allowable under paragraph (3)* of this subsection ... and reimbursement for actual, necessary expenses incurred by such attorney ...." 11 U.S.C. § 503(b)(4) (emphasis added).[3]

---

**3.** The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 does not mate-

Paragraph (3) in turn allows administrative expenses for "the actual, necessary expenses, *other than compensation and reimbursement specified in paragraph (4) of this subsection,* incurred by ... (D) a creditor, an indenture trustee, an equity security holder ... in making a substantial contribution in a case under chapter 9 or 11 of this title ...." 11 U.S.C. § 503(b)(3)(D) (emphasis added). Thus, to recover attorneys' fees and expenses, a literal reading of § 503(b)(4) would require the substantial-contribution applicant to first incur allowable expenses under § 503(b)(3), which in turn would require the allowable expenses to be something other than attorneys' fees and expenses. Neither the indenture trustee nor the four founders have alleged that they incurred allowable § 503(b)(3) expenses.

The Third Circuit appears to follow this literal reading of sections 503(b)(3) and 503(b)(4). *Lebron v. Mechem Fin. Inc.,* 27 F.3d 937, 943 (3d Cir.1994) (observing that " § 503(b)(4) authorizes awards of legal and accounting fees *only in situations within the scope of § 503(b)(3)* ...."*) (emphasis added). In contrast, the Ninth Circuit Bankruptcy Appellate Panel argues that a literal reading of § 503(b) leads to an absurd result:

imagine two creditors, A & B, each in possession of information that a debtor had fraudulently squirreled away assets of the estate. Creditor A makes a free local call to his attorney, reveals the information and asks counsel to pursue

the assets. Creditor B buys a stamp and sends his attorney a letter with the information and instructions to pursue the assets. Assuming that both creditors made a substantial contribution, only Creditor B, having fortuitously incurred the expense of a 32¢ stamp, could recover his fees.

*In re Sedona Institute,* 220 B.R. 74, 79 (9th Cir. BAP 1998). The court agrees with the *Sedona* court that there "is no logical reason to afford disparate treatment to similarly situated creditors, both of whom provided a substantial benefit to the estate, based solely upon whether they incurred independent expenses allowable under § 503(b)(3)." *See id.* at 80.

Though the Fifth Circuit has not directly addressed the proper reading of sections 503(b)(3) and 503(b)(4), it seems to have no problem allowing attorneys' fees and expenses to applicants who have not established allowable expenses under § 503(b)(3). *See In re DP Partners Ltd. P'ship,* 106 F.3d 667, 674 (5th Cir.1997), *cert. denied,* 522 U.S. 815, 118 S.Ct. 63, 139 L.Ed.2d 26 (1997) (remanding the case for a determination of reasonable attorney's fees even though no independent allowable § 503(b)(3) expense was mentioned). Bankruptcy courts in Texas have allowed attorneys' fees and expenses without requiring a formal showing of incurred expenses allowable under § 503(b)(3). *See In re Datavon, Inc.,* 303 B.R. 119, 122 (Bankr.N.D.Tex.2003); *In re Speeds Billiards & Games, Inc.,* 149 B.R. 434, 436, 441 (Bankr.E.D.Tex.1993); *see also Sedona,* 220 B.R. at 78 (listing non-Texas cases).

rially change the substantial-contribution statute, and would not change the court's analysis even if it applied to this case. The only change is to § 503(b)(4), which now reads: "(4) reasonable compensation for professional services rendered by an attorney or

an accountant of an entity whose expense is allowable under *subparagraph (A), (B), (C), (D), or (E) of* paragraph (3) of this subsection ... and reimbursement for actual, necessary expenses incurred by such attorney or accountant" (emphasis added).

Because § 503(b) is one of those "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters," *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), the indenture trustee and the four founders' failure to allege allowable § 503(b)(3) expenses does not prevent them from recovering attorneys' fees and expenses under § 503(b)(4), assuming of course that they can show they made a substantial contribution. *See In re Gurley,* 235 B.R. 626, 635 (Bankr. W.D.Tenn.1999) (following *Sedona* ); *In re Wind N' Wave,* 328 B.R. 176, 177–178, 2005 WL 1223601 at *1 (9th Cir. BAP 2005) (same).

**Standards governing the substantial-contribution inquiry**

 The substantial-contribution inquiry is a factual one. *In re Consolidated Bancshares, Inc.,* 785 F.2d 1249, 1253 (5th Cir.1986). The policy behind allowing substantial-contribution applications "is to promote meaningful creditor participation in the reorganization process." *Id.* Services that substantially contribute to a case are those that "foster and enhance, rather than retard or interrupt the progress of reorganization." *Id.* At the same time meaningful creditor participation is encouraged, however, courts must be sensitive to the danger of mushrooming administrative expenses. *In re Alert Holdings Inc.,* 157 B.R. 753, 757 (Bankr.S.D.N.Y. 1993). Section 503(b) "should not become a vehicle for reimbursing every creditor who elects to hire an attorney." *In re Jack Winter Apparel, Inc.,* 119 B.R. 629, 637 (E.D.Wis.1990). Accordingly, courts narrowly construe the substantial-contribution statute and grant substantial-contribution applications only in "unusual" or "rare" cases. *In re Randall's Island Family Golf Centers, Inc.,* 300 B.R. 590, 598 (Bankr.S.D.N.Y.2003) ("rare"); *In re 9085 E. Mineral Office Bldg., Ltd.,* 119 B.R. 246, 250 (Bankr.D.Colo.1990) ("unusual"). That narrow construction is also con-

sistent with the general doctrine that priority statutes, such as § 503(b), should be strictly construed to preserve the estate for the benefit of creditors. *In re Federated Dep't Stores, Inc.,* 270 F.3d 994, 1000 (6th Cir.2001); *In re Commercial Fin. Servs., Inc.,* 246 F.3d 1291, 1293 (10th Cir. 2001).

 The applicant must prove by a preponderance of the evidence that he rendered a substantial contribution. *In re Canton Jubilee, Inc.,* 253 B.R. 770, 775 (Bankr.E.D.Tex.2000); *In re Granite Partners, L.P.,* 213 B.R. 440, 447 (Bankr. S.D.N.Y.1997). The court is not obligated "to pick apart the fee application to explain which services are not compensable; the [applicant must] prove, by a preponderance of the evidence, which services are." *Id.* at 452. Conclusory statements cannot satisfy the applicant's burden of proof. *9085 Mineral,* 119 B.R. at 249. Thus, courts will not grant substantial-contribution claims when the applicant cannot articulate a benefit conferred upon the estate. *See Granite Partners,* 213 B.R. at 449–50 ("Primavera did not make a substantial contribution by violating the automatic stay and causing increased administrative expenses... [A]pplicants are seeking a substantial contribution award for unsuccessfully defending a position their clients were not entitled to take under applicable law").

 In the Fifth Circuit, the substantial-contribution applicant's motive is largely irrelevant to the inquiry. *DP Partners,* 106 F.3d at 673; *cf. In re Cellular 101, Inc.,* 377 F.3d 1092, 1097 (9th Cir.2004) (listing the conflicting circuit case law).

**The causal element of substantial contribution**

 The substantial-contribution applicant must show that his services have

some causal relationship to the alleged substantial contribution. *See DP Partners*, 106 F.3d at 673. Some courts have used a but-for test to determine whether that causal relationship exists. *See In re D.W.G.K. Restaurants, Inc.*, 84 B.R. 684, 690 (Bankr.S.D.Cal.1988) (using the phrase "but for"); *Alert Holdings*, 157 B.R. at 759 (denying the substantial-contribution application when "even without the benefit of the LPOC's objection, most of the changes to the disclosure statement would have been made anyway"); *In re New Power Co.*, 311 B.R. 118, 124 (Bankr.N.D.Ga.2004) (denying the substantial-contribution application because "the Court must conclude that the Examiner would have been appointed ... absent [the applicant's alleged contribution]"). However, satisfying the but-for requirement by itself is not enough to establish the causal relationship.

▮ Suppose, for example, a major secured creditor's stubbornness is about to derail a case. At the last minute, the secured creditor decides to be more cooperative, which allows the debtor to achieve confirmation or to close a crucial sale. But for the secured creditor's cooperation, the debtor would not have been able to reorganize. The secured creditor's change of heart, however, cannot mean it made a substantial contribution. Otherwise, all creditors in a Chapter 11 case could claim they made a substantial contribution merely by cooperating. Stated more generally, a creditor does not substantially contribute to a case by initially taking an obstructionist stance and then cooperating so the case may move forward.[4] To establish the causal relationship, it is necessary but not sufficient to satisfy the but-for test.

## What is the meaning of "substantial contribution"?

The Code does not define "substantial contribution." Most courts attempt to give meaning to "substantial contribution" by reciting variations on a core set of phrases: substantial contribution is (1) contribution that results in "significant and tangible benefit" or "concrete benefit" to the estate, *New Power*, 311 B.R. at 124; (2) contribution that "confers a direct, significant and demonstrably positive benefit upon the estate," *Alert Holdings*, 157 B.R. at 757; *see also In re Gen. Homes Corp. FGMC, Inc.*, 143 B.R. 99, 103 (Bankr. S.D.Tex.1992) ("significant demonstrable benefit to the estate and creditors"); or (3) contribution that "lead[s] directly to tangible benefits to the creditors, debtor or the estate," *In re Alumni Hotel Corp.*, 203 B.R. 624, 631 (Bankr.E.D.Mich.1996). The Fifth Circuit, along with at least one bankruptcy court, resorted to Webster's Dictionary in defining "substantial contribution" as contribution that is "considerable in amount, value or worth." *See DP Partners*, 106 F.3d at 673; *Alert Holdings*, 157 B.R. at 760 ("Substantial means just that; important, essential, plentiful.").

The problem with all these synonyms and definitions is that they "do little to shed any real light on how to apply the direct benefit rule in practice." *In re Inte-*

---

4. *See In re Alumni Hotel Corp.*, 203 B.R. 624, 632 (Bankr.E.D.Mich.1996) ("[Applicant] and his counsel cannot take credit for actually settling the case, because *settlement is not a unilateral action....* If [applicant's] fees were allowed under § 503(b)(3)(D) and (b)(4) ... all the parties to this settlement might well argue that they, too, made a 'substantial contribution' by agreeing to compromise their claims.") (emphasis added); *see also In re*

*Intelogic Trace, Inc.*, Case No. 94–52172, DOC. # 644 at 7 (Bankr.W.D. Tex. December 1996 Decision and Order) ("The common wisdom is that the most successful reorganizations are those marked by consensual activity, negotiation, and the like.... It may be that, as a matter of policy, a rule that 'buys' cooperation and fosters successful reorganization is a good thing. [However, that] is not the rule that Congress ... enacted ....").

*logic Trace, Inc.,* Case No. 94–52172, DOC. # 644 at 6 (Bankr.W.D. Tex. December 1996 Decision and Order). One court attributes the "imprecision of these terms [to] the inherent imprecision of the inquiry generally." *In re Baldwin–United Corp.,* 79 B.R. 321, 338 (Bankr.S.D.Ohio 1987). This court disagrees.

■ It is more accurate to attribute the unhelpful plethora of synonyms to the inadequacy of language, not to the "inherent imprecision of the inquiry." The substantial-contribution inquiry is similar to the excusable-neglect inquiry in that "[n]o single circumstance controls[;] nor is a court to simply proceed down a checklist ticking off traits. Instead, courts are to look for a synergy of several factors that conspire to push the analysis one way or the other." *See In re 50–Off Stores, Inc.,* 220 B.R. 897, 901 (Bankr.W.D.Tex.1998) (discussing relevant factors in an excusable-neglect inquiry). Exercising informed discretion in determining whether activities rise to the level of substantial contribution is certainly not a mechanical exercise, but the inability of language to fully portray what goes on in judges' minds does not mean judges abandon analysis and precision the first chance they get to exercise discretion. By way of analogy, we easily and regularly recognize familiar faces in a crowded room. Our inability to verbally articulate how we readily recognize our friends' faces does not change the fact that we can do so with precision and reliability. *See* Bart Kosko, FUZZY THINKING: THE NEW SCIENCE OF FUZZY LOGIC 208–212 (1993) (discussing how the brain and other neural networks recognize patterns).

Because many courts have struggled to articulate why they have or have not found a contribution to be substantial, it is perhaps more instructive to focus on the facts of particular cases, to look at the different "faces," so to speak, of substantial contri-

bution. Consistent with that approach, the Fifth Circuit urges bankruptcy courts to "make specific and detailed findings on the substantial contribution issue." *DP Partners,* 106 F.3d at 673. Fortunately, we need not confront an unorganized morass of facts because the Fifth Circuit has set out a baseline test that can guide us through the case law.

### The Fifth Circuit's cost-benefit test

■ The Fifth Circuit's baseline cost-benefit test says that "[a]t a minimum … the court should weigh the cost of the claimed fees and expenses against the benefits conferred upon the estate which flow directly from those actions. Benefits flowing to only a portion of the estate or to a limited class of creditors are necessarily diminished in weight." *DP Partners,* 106 F.3d at 673.

The cost-benefit test was widely used even before the Fifth Circuit required its use as a screening device. *See Baldwin–United,* 79 B.R. at 343 (awarding applicant $21,728 for bringing additional $5 million into the estate by attracting a competing bidder); *In re McLean Indus., Inc.,* 88 B.R. 36, 39 (Bankr.S.D.N.Y.1988) (awarding applicant $6,210 for bringing additional $1.15 million into the estate by objecting to a sale and increasing the bid amount); *In re Roberts,* 93 B.R. 442, 445–46 (D.S.C. 1988) (awarding creditor $3,175 for bringing $75,000 in interest payments for all unsecured creditors); *In re Kidron, Inc.,* 278 B.R. 626, 630, 634 (Bankr.M.D.Fla. 2002) (awarding creditor a total of $19,176.54 in attorneys' fees for bringing an additional $2 million into the estate); *In re Pow Wow Campground, Inc.,* 296 B.R. 81, 88 (Bankr.D.N.H.2003) (awarding creditor $4,606.46 for increasing payout to unsecured creditors from 50% ($35,805.63) to 100% plus interest ($104,438.87), an increase of $68,633.24); *In re W.G.S.C. Enters., Inc.,* 47 B.R. 53, 57–58 (Bankr.

N.D.Ga.1985) (payout to unsecured creditors increased from 50% to 100%); *In re Condere Corp.*, 251 B.R. 693, 695 (Bankr. S.D.Miss.2000) (payout to unsecured creditors increased from 25% to 65%).

Though *DP Partners* did not specify an upper limit to the cost-to-benefit ratio, some courts have denied substantial-contribution claims when that ratio was too high. *See In re Glickman, Berkowitz, Levinson & Weiner, P.C.*, 196 B.R. 291, 297 (Bankr.E.D.Pa.1996) (range of 60% to 75% cost-benefit ratio is too high); *cf. Baldwin–United* (0.43%); *McLean* (0.5%); *Roberts* (4.2%); *Kidron* (0.96%); *Pow Wow* (6.7%). That makes sense because whatever benefit the applicant confers upon the estate cannot be substantial (that is, "considerable in amount, value or worth") when attorneys' fees and other costs eat up most of the benefits. Even if the cost-benefit ratio is low, no substantial contribution is made when the benefit is minimal or incidental. *See In re F.E. Frederick Enters., Inc.*, 146 B.R. 360, 363 (Bankr.W.D.Pa.1992) (creditor holding 40% to 69% of the unsecured debt who negotiated plan provision to start payments to unsecured creditors 20 months earlier than the debtor's plan did not make substantial contribution); *Baldwin–United*, 79 B.R. at 343 (no substantial contribution made by raising issues obvious to everyone—"this issue was blindingly apparent to almost everyone (including this Court) from the day these cases were filed, and probably long prior to that date.").

■ An obvious corollary of the cost-benefit test is that no substantial contribution is made when the cost exceeds the benefit or when cost involves needless duplication of time and effort. *See In re Lease–A–Fleet, Inc.*, 148 B.R. 419, 429

(Bankr.E.D.Pa.1992) (cost of $ 162,000 "clearly exceeded the amounts recovered ('tens of thousands' of dollars)"); *Consolidated Bancshares*, 785 F.2d at 1252 ("needless duplication"); *Gen. Homes*, 143 B.R. at 103 (court should consider "whether the services were duplicative of services rendered by a committee, the debtor, or the attorneys for a committee or the debtor"). A favorable cost-benefit ratio by itself, however, is not enough to constitute substantial contribution. The applicant "must still demonstrate that the contribution it made to the case was 'considerable in amount, value or worth.'" *See Canton*, 253 B.R. at 775. Helpful as the cost-benefit test may be, the "development of a more concrete standard of substantial contribution is best left on a case-by-case basis." *DP Partners*, 106 F.3d at 673.

## The benefit to the estate need not be reduced to, or expressible in, monetary terms

■ "Although the amount to be allowed as an administrative expense must be measured in dollars and cents … the question whether the estate has been benefitted cannot be so narrowly confined. [The estate could receive] other less readily calculable benefits, such as the ability to continue to conduct business as usual." *In re TransAmerican Natural Gas Corp.*, 978 F.2d 1409, 1420 (5th Cir.1992), *cert. dismissed*, 507 U.S. 1048, 113 S.Ct. 1892, 123 L.Ed.2d 646 (1993). Other examples of less readily calculable benefits that can support a finding of substantial contribution include proposing a plan that is ultimately confirmed when the debtor did not propose any plan,[5] enhancing disclosure to an impaired shareholder class,[6] providing substantial assistance in drafting and con-

---

5. *In re Jelinek*, 153 B.R. 279, 281 (Bankr. D.N.D.1993).

6. *In re Texaco*, 90 B.R. 622, 629–30 (Bankr. S.D.N.Y.1988).

firming a plan,[7] preserving the examiner's right to object to insider-employee claims,[8] urging the appointment of a Chapter 11 trustee,[9] and lowering the "temperature" of a case by preventing excessive litigation and encouraging cooperation.[10]

■ The problem in considering benefits that are not readily calculable is figuring out how to discern the activities that qualify as substantial contribution without the aid of an objective cost-benefit ratio. The clearest rule courts have settled on is that expected or routine activities in a Chapter 11 case do not constitute substantial contribution. *See, e.g., In re The Columbia Gas Sys., Inc.,* 224 B.R. 540, 548 (Bankr.D.Del.1998). By the same token, expected or routine activities in the guise of extensive or active participation also cannot establish substantial contribution. *See Granite Partners,* 213 B.R. at 445 (citing cases). The efforts and activities of the applicant or its attorney may be admirable, excellent, or done with professionalism, but that cannot elevate expected or routine activities to the level of substantial

contribution. *See Columbia Gas,* 224 B.R. at 555 ("admirable"); *Granite Partners,* 213 B.R. at 450 ("excellent"); *Baldwin–United,* 79 B.R. at 341 ("professionalism").

Examples of expected or typical activities include reviewing documents and attending hearings,[11] negotiating reductions in fee applications,[12] reviewing the debtor's financial status,[13] proposing agreeable terms through negotiation,[14] and commenting on the disclosure statement and plan of reorganization.[15] Because the substantial-contribution inquiry is fact intensive, activity in one case that establishes substantial contribution may not necessarily establish it in another case—hence the slight overlap between the examples of routine and non-routine activities listed above.

### The indenture trustee's substantial-contribution claim

■ The indenture trustee, a member of the creditors' committee, represents holders ("Noteholders") of about $95 million in senior subordinated notes ("Notes"),[16] which represents the majority

---

7. *In re Richton Int'l Corp.,* 15 B.R. 854, 856 (Bankr.S.D.N.Y.1981) (creditor's lawyer "facilitated the progress of these cases [by reconciling the Debtors and creditors, and] substantially aided the formulation and adoption of the Plan of Reorganization"); *In re Baldwin–United Corp.,* 79 B.R. 321, 340–341 (Bankr.S.D.Ohio 1987).

8. *In re New Power Co.,* 311 B.R. 118, 127 (Bankr.N.D.Ga.2004).

9. *In re Paolino,* 71 B.R. 576, 580 (Bankr. E.D.Pa.1987) (warning that it was not creating a *per se* rule that activities leading to the appointment of a trustee automatically constitutes substantial contribution).

10. *See Baldwin–United,* 79 B.R. at 343 (creditor's lawyer "often stood as the only voice of reason amid the appearance of a continuous, movable brawl among the members of the BU committee and its counsel").

11. *Baldwin–United,* 79 B.R. at 341 ("Reviewing documents and attending hearings, with-

out more, does not rise to the level of a substantial contribution.").

12. "[O]bjecting to a fee request and negotiating a fee reduction, absent some unusual circumstance-which is not present here ... are the type of [activities and] negotiations that occur between the attorneys of the various interested parties in every Chapter 11 case." *In re Glickman, Berkowitz, Levinson & Weiner, P.C.,* 196 B.R. 291, 298 (Bankr.E.D.Pa.1996).

13. *Jack Winter,* 119 B.R. at 633–34.

14. *Alumni Hotel,* 203 B.R. at 632.

15. *Jack Winter,* 119 B.R. at 634.

16. Some may insist on using the labels "debenture bonds" and "debenture bondholders."

of the unsecured debt. The debtors' second amended plan proposed to give stock warrants to the unsecured-creditor class, which included the Noteholders. DOC. # 1128. The indenture trustee considered the warrants to be of little value because of the limited conditions under which they could be exercised,[17] and it negotiated a different treatment for the Noteholders. Under the debtors' third amended (and confirmed) plan, the Noteholders receive a 49% equity interest in the reorganized parent debtor company. DOC. # 1745 (third amended plan); DOC. # 1754 (order confirming third amended plan). The rest of the general unsecured creditors are not receiving any equity in the reorganized debtors. The third amended plan gives them substantially the same warrants as proposed by the second amended plan.

The indenture trustee and its counsel take credit for providing adequate notice to, and obtaining votes from, the individual Noteholders. Because the notes were held by financial intermediaries "in street name" for the beneficial noteholders, a procedure had to be set up for communicating with the individual Noteholders. The indenture trustee and its counsel also take credit for arranging the mechanics of distributing the 49% equity stake to the Noteholders, and for making the procedural suggestion that the indenture trustee execute all operative documents on their behalf, which avoided the expense of getting signatures of all the individual Noteholders. The indenture trustee claims its procedural suggestion "saved the Debtors and the reorganized company a significant amount of time, complications and money." DOC. # 1868. The Committee similarly

claims "the costs associated with obtaining signatures from all [the Noteholders] would have been exorbitant and would have unnecessarily delayed the effective date of the Debtors' confirmed plan." DOC. # 2028.

Finally, the indenture trustee objected to the debtors' second amended plan by joining in the objection filed by the Committee. *See* DOC. # 1307 (Committee's objection to the second amended plan as violating the absolute-priority rule) *and* DOC. # 1370 (indenture trustee's objection). The indenture trustee argues that its objection to confirmation, its activities in streamlining and setting up cost-saving procedures, and most importantly, its negotiating a 49% equity stake for the Noteholders all constitute substantial contribution.

## The indenture trustee did not make a substantial contribution

The primary obstacle to the indenture trustee's application is that almost all of its activities benefitted the Noteholders exclusively. Of course, there is nothing wrong with the indenture trustee, who owes a fiduciary duty to the Noteholders,[18] acting in the Noteholders' interests. But that is problematic under the cost-benefit test because "[b]enefits flowing to only a portion of the estate or to limited classes of creditors are necessarily diminished in weight." *DP Partners*, 106 F.3d at 673. Such benefits are "necessarily diminished in weight" because they cannot be "benefits conferred upon the [entire] estate." *Id.* And if little or no benefits are conferred upon the estate, then the applicant cannot satisfy the baseline cost-benefit test, which all sub-

---

**17.** The "Warrants are only exercisable if, during the 60 month term, Reorganized AMPAM (including any of the Reorganized Subsidiaries) . . . is sold to a third party other than the management of such entities." DOC. # 1127 (second amended disclosure statement), Exh.

F ("Correspondence from Official Committee of Unsecured Creditors Regarding the Plan").

**18.** *See* Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa *et seq.* and § 77qqq.

stantial-contribution applicants must satisfy.

The few activities that did not benefit exclusively the Noteholders yielded benefits to the estate that were minimal, or only incidental to the benefit conferred upon the Noteholders. The court fails to see any substantial contribution in the indenture trustee's objection to the second amended plan, which simply joins the Committee's objection and raises no new issues. The cost-saving procedures were primarily for the benefit of the Noteholders, who were thereby able to receive notice of the plan, vote, and receive the 49% equity stake. *See In re Rockwood Computer Corp.*, 61 B.R. 961, 965–66 (Bankr.S.D.Ohio 1986) (denying the indenture trustee's substantial-contribution application when the trustee acted primarily for the benefit of the bondholders); *In re Buttes Gas & Oil Co.*, 112 B.R. 191, 195 (Bankr.S.D.Tex.1989) (same); *Gen. Homes*, 143 B.R. at 103 (same). The indenture trustee gave the court no indication how much in costs were avoided beyond conclusory statements like "significant amount of time, complications and money," or "exorbitant" costs. And supposing the avoided costs could not readily be put into monetary terms, the indenture trustee does not explain how it went beyond what was expected of it in serving the Noteholders' interests. *See Baldwin–United*, 79 B.R. at 340 (indenture trustee expected to communicate with its constituents).

Courts have granted substantial-contribution applications by indenture trustees, but under much different facts. For example, in *In re Penn–Dixie Industries, Inc.*, 18 B.R. 834 (Bankr.S.D.N.Y.1982), the court granted the two indenture trustees' substantial-contribution applications. 18 B.R. at 838. The *Penn–Dixie* court unfortunately provides no details on how

the two indenture trustees rendered a substantial contribution. However, the creditors in *Penn–Dixie* had a 100% recovery, and the original shareholders maintained a significant equity interest in the reorganized debt. *Id.* at 835. The results in our case are not as spectacular. In *Schepps*, the benefits generated by the indenture trustee's activities "accrued to an entire class of unrepresented creditors, as well as the estate." *In re Schepps Food Stores, Inc.*, 1994 BANKR. LEXIS 1365 at *12 n. 3 (Bankr.S.D.Tex. July 7, 1994). In granting the indenture trustee's substantial-contribution application, the *Schepps* court found that the indenture trustee "provided benefit to not only its own constituents, but also the estate, other creditors and the equityholders.... [The indenture trustee's] efforts resulted in significant and demonstrable benefit to all." *Id.* at *13. In our case, the indenture trustee does not show how it benefitted the estate, other creditors, and equityholders.

**The indenture trust document is irrelevant to the substantial-contribution application**

The indenture trust document provides that "[w]hen the Trustee incurs expenses or renders services in connection with an Event of Default [such as filing for bankruptcy], the expenses (including the reasonable charges and expenses of its counsel) and the compensation for the services *are intended to constitute expenses of administration* under any applicable Federal ... bankruptcy ... law." *See* DOC. # 1868, Exh. A, § 6.7 (emphasis added). The indenture trustee mentions § 6.7 in passing, though it is not clear whether the indenture trustee is arguing that § 6.7 of the trust document supports its substantial-contribution claim. For the sake of

completeness, the court will assume the indenture trustee so argues. That being the case, the court disagrees: § 6.7 offers no such support. An applicant's intent is not relevant in the substantial-contribution inquiry. *DP Partners*, 106 F.3d at 673. Even if § 6.7 establishes a contractual right to reimbursement, it has no bearing on a substantial-contribution application. *In re Revere Copper and Brass, Inc.*, 60 B.R. 892, 895 (Bankr.S.D.N.Y.1986); *Gen. Homes*, 143 B.R. at 103.

**The SEC's proposed standard for substantial contribution**

Pursuant to § 1109(a), the SEC urges the court to employ a broader reading of what constitutes substantial contribution when considering applications by indenture trustees. The SEC emphasizes the policy of meaningful creditor participation behind § 503(b) and its predecessor statutes under the Bankruptcy Act. *See In re Jensen–Farley Pictures, Inc.*, 47 B.R. 557, 565–69 (Bankr.D.Utah 1985) (discussing § 503(b)'s legislative history and predecessor statutes under the Bankruptcy Act); *Rockwood*, 61 B.R. at 965 (same); *and In re U.S. Lines, Inc.*, 103 B.R. 427, 429 (Bankr.S.D.N.Y.1989) (same). According to the SEC, the Chandler Act of 1938 and the Trustee Indenture Act of 1939 show Congress' intent to encourage the participation, in particular, of indenture trustees in reorganization cases out of "concern that public bondholders need active representation." DOC. # 2015 at 3.

But, in the SEC's view, courts' interpretation of "substantial contribution" deters Congress' intent. First, courts focus on whether the applicant's services benefitted all parties in the case instead of "whether and how the services rendered, while benefitting the [applicant], contributed to the overall resolution of the case." *Id.* at 9. Second, courts misread § 503(b), which states "substantial contribution *in a case*,"

not "substantial contribution *to the estate*." The SEC argues the "statutory language should be given its ordinary meaning [that is] the focus of the inquiry should be on the case or reorganization process, and not on the debtor or its property." *Id.* at 9–10.

The SEC proposes a two-part test it claims properly reflects Congress' intent for indenture trustees to take active roles in reorganization cases: an indenture trustee makes a substantial contribution under § 503(b) "if (1) the indenture trustee has, through its representation of the interests of bondholders, made demonstrable efforts towards *furthering the reorganization process;* and (2) the indenture trustee's services or those of its counsel *do not duplicate* the services of official participants or other indenture trustees." DOC. # 2015 at 2 (emphasis added).

There are several problems with the SEC's arguments. The court fails to see how the SEC's proposed test changes what is already set out in the case law. The Fifth Circuit recognizes that "services which substantially contribute to a case are those which foster and enhance, rather than retard or interrupt the progress [of] reorganization," which is the same as the first part of the SEC's test. *See Consolidated Bancshares*, 785 F.2d at 1253. The Fifth Circuit also recognizes that § 503(b) requires the "judge to scrutinize claimed expenses for waste and *duplication* ...." *DP Partners*, 106 F.3d at 673 (emphasis added); *see also Gen. Homes*, 143 B.R. at 103 (court should consider "whether the services were duplicative of services rendered by a committee, the debtor, or the attorneys for a committee or the debtor").

More importantly, it is hard to see how Congress intended to apply a laxer or different standard of substantial contribution for indenture trustees when § 503(b)(3)(D) does not single out indenture trustees for

special treatment. Indenture trustees do get special treatment in that they are the only substantial-contribution applicant who can also apply for reimbursement of their fees. *See* 11 U.S.C. § 503(b)(5). But in order to recover their fees under § 503(b)(5), the indenture trustee must still make a substantial contribution, which has the same meaning as "substantial contribution" under § 503(b)(3)(D). *See Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 479, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992) ("[It is a] basic canon of statutory construction that identical terms within an Act bear the same meaning.").

Also, it is not apparent to this court that other courts are misreading § 503(b) as "substantial contribution *to the estate*" when it actually says "substantial contribution *in a case.*" The court found no cases that misquote § 503(b) in that manner. A more reasonable explanation is that courts are simply emphasizing a key factor—"significant and demonstrable benefit to the debtor's estate and the creditors"[19]—in determining whether a substantial contribution *in a case* has been made. *See DP Partners*, 106 F.3d at 673 (recognizing that further development of the substantial-contribution standard "is best left on a case-by-case basis" before stating the cost-benefit test).

The SEC cites several cases in arguing that courts "recognize the importance of active participation of indenture trustees in complex bankruptcy cases." DOC. # 2015 at 7. All but one of the cases were decided under the Bankruptcy Act. Still, the SEC claims those cases are relevant because the legislative history of § 503(b) "indicates that Congress did not intend to change the standard for compensation that existed previously." *Id.* at 5. The legislative history explains that the "phrase 'substantial contribution in the case' is derived from Bankruptcy Act §§ 242 and 243." H.R.Rep. No. 595, 95th Cong., 1st Sess. 355 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6311; S.Rep. No. 989, 95th Cong., 2d Sess. 66–67 (1978), U.S.Code Cong. & Admin.Code 1978, pp. 5787, 5852–53; *but see* Bankruptcy Act of 1898 §§ 242, 243, 11 U.S.C. §§ 642, 643 (1976) (not using the phrase "substantial contribution") *and* COLLIER ON BANKRUPTCY, Appendix A, part 3 at 140–141 (2004) (containing the text of §§ 242 and 243).

Not all the cases the SEC cites support their argument. The unpublished case of *Schepps* viewed substantial contribution as consisting of "actions which have provided *the estate and all parties in interest*, including creditors and shareholders, with a tangible benefit." *In re Schepps Food Stores, Inc.*, 1994 BANKR. LEXIS 1365 at *6 (Bankr.S.D.Tex. July 7, 1994) (emphasis added). The second case the SEC cites, *In re Boston, Maine Corp.*, expressed the same idea: "While the efforts of the [indenture trustee] and their counsel were of benefit to the First Mortgage Bondholders, the influence of their efforts extended beyond that goal and *perceptibly benefited* [sic] *the entire estate.*" *In re Boston and Maine Corp.*, 62 B.R. 199, 203 (D.Mass. 1986) (emphasis added; decided under the Bankruptcy Act).

The other two cases the SEC relies on go against case authority decided under the Bankruptcy Code. The court in *New York, New Haven* explained that, under the Bankruptcy Act, indenture trustees may be paid administrative expenses for performing their fiduciary duty:

An indenture trustee serves in a fiduciary capacity [*see* Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa *et seq.*] and is under a duty to look out for the bondholders' interests in reorganization and

19. *Consolidated Bancshares*, 785 F.2d at 1253.

to guard the value of the assets underlying those interests. It also means that the trustee must keep informed of the reorganization proceedings and participate therein ... and to offer suggestions and otherwise intervene where necessary to perform its functions. *Generally such services aid the administration of the estate and the reorganization of the debtor, and may be compensated out of the estate.*

*In re New York, New Haven & Hartford R.R. Co.,* 421 F.Supp. 249, 258 (D.Conn. 1976) (emphasis added); *see also In re Central R.R. Co. of N.J.,* 477 F.Supp. 1228, 1232 (D.N.J.1979) (also decided under the Bankruptcy Act, and relying on *New York, New Haven*).

The difficulty with *New York, New Haven's* reasoning (the pay-me-because-I-am-doing-my-fiduciary-duty argument) is that it is entirely possible for an indenture trustee to fulfill its fiduciary duty to the bondholders without making a substantial contribution in a Chapter 11 case. *In re Flight Transp. Corp. Secs. Litig.,* 874 F.2d 576, 580–81 (8th Cir.1989) (holding that substantial contribution "require[s] something more than satisfactory performance of fiduciary duties"); *In re County of Orange,* 179 B.R. 195, 203 (Bankr.C.D.Cal. 1995); *see also* Mark A. Cohen, *Reimbursement of Indenture Trustees for Substantial Contribution Under Section 503 of the Bankruptcy Code,* 59 FORDHAM L. REV. 647, 667 n. 135 (1991) (listing more cases). Even the SEC itself admits "it is not enough simply to represent the interests of bondholders in connection with a reorganization case." DOC. # 2015 at 7. But that is exactly what the indenture trustee is and should be doing when it fulfills its fiduciary duty to the bondholders (to the extent that it can as a committee member). Once again, "[b]enefits flowing ... to limited classes of creditors are necessarily diminished in weight" in applying the cost-benefit test. *DP Partners,* 106 F.3d at 673. In addition, it is expected that indenture trustees will not violate their fiduciary duty, and as expected, routine activities do not constitute substantial contribution.

Finally, § 503(b)(3)(D) says that "there shall be allowed administrative expenses ... including the actual, necessary expenses ... incurred by ... an indenture trustee ... *in making a substantial contribution in a case* under chapter 9 or 11 ...." It does not say that administrative expenses may be allowed for "actual, necessary expenses incurred by an indenture trustee that complies with its fiduciary duties." *See Flight Transp.,* 874 F.2d at 581. The same reasoning applies to § 503(b)(5).

For the reasons stated above, the court declines to adopt the SEC's proposed two-part test for substantial contribution, and declines to adopt a broader meaning of "substantial contribution" solely for indenture trustees. For the reasons explained above, the court DENIES the indenture trustee's substantial-contribution application.

### The four founders' substantial-contribution claims

The four founders are equity shareholders, and were directors and officers of the debtors at various times. They claim they made a substantial contribution for substantially the same reasons. Christianson (represented by McGinnis) and Smith(represented by H & L) filed their application together (DOC. # 2013); Richey (represented by Winthrop) and Parks (represented by C & T) filed theirs together as well (DOC. # 2074).

The four founders claim they substantially contributed to the debtors' case by negotiating and achieving consensus on a variety of plan-related documents: em-

ployment agreements,[20] corporate-governance-and-voting agreement,[21] charter documents (certificate of incorporation[22] and bylaws[23]), option and warrant agreements,[24] loan documents,[25] an allocation agreement,[26] and the plan itself and other supplemental plan documents. DOC. #2013 at 4–12; DOC. #2074 at 9–11. The court will discuss each set of documents in turn and the alleged substantial contribution made in each set.

H & L says it took the lead in achieving consensus on the employment agreements. The senior lenders required the founders to execute new employment agreements with "stiff" non-compete clauses before agreeing to provide additional post-confirmation funding to the debtors.[27] H & L says it "was primarily responsible" for circulating revised drafts of the employment agreements, incorporating agreed upon revisions, and drafting the final form of the employment agreements, which served as the template for the employment agreements ultimately signed by all the founders. *Id.* at 6. The two key provisions H & L drafted are the non-compete clauses and the disaggregation provisions. The disaggregation provisions detail when Christianson and Smith could split off from AMPAM and go back to working exclusively with their respective subsidiaries, who would then compete with AMPAM and other disaggregated subsidiaries. MLK claims it provided substantial assistance to H & L on the employment agreements. Richey and Parks also cite their respective counsels' role in reviewing and proposing revisions to the employment

agreement as part of the benefit they conferred upon the estate. DOC. #2074 at 10.

Because the debtors envisioned greater autonomy for the subsidiaries, the parties had to work out issues related to corporate governance and voting. H & L says it also took the lead role in drafting, negotiating, and obtaining consensus on the corporate-governance-and-voting agreement. Most notably, "H & L took the lead [with regard to negotiating provisions] providing for … each Founder to have full autonomy … in managing and operating the subsidiary under his stewardship … [and proposing a different composition for the board of directors] contrary to the three person AMPAM board of directors originally proposed in the Plan [which] led to gridlock among the parties given, among other reasons, the power granted to the AMPAM board to terminate autonomous subsidiary management…." DOC. #2013 at 7. Winthrop (counsel to Richey), however, also credits its own "extensive [review of,] comments regarding, proposed modifications to" the corporate-governance-and-voting agreement as providing substantial contribution. DOC. #2074, Declaration of Opera at 9.

As for the charter documents, McGinnis claims it "led the review, analysis, revisions and negations [sic; read 'negotiations']" of amendments to AMPAM's certificate of incorporation and bylaws. DOC. #2013 at 8. The court highlights two items: in the certificate of incorporation, "a heavily negotiated allocation of common shares among the Founders and the [Note-

20. Exh. 151B, tabs 12–14.

21. *Id.* at tab 9.

22. *Id.* at tab 8.

23. *Id.* at tab 7.

24. *Id.* at tabs 10–11.

25. *Id.* at tab 6 *and* Exh. 151A, tab 1.

26. Exh. 151B at tab 3.

27. *See* Exh. 151A, tab 2, Financing Agreement § 5.03(g).

holders]," and in the bylaws, "provisions relating to the composition of the AMPAM board of directors and the election of members thereto and the removal of members therefrom." *Id.* Winthrop and C & T also credit their review of, and proposed revisions to, the certificate of incorporation and bylaws as part of Richey and Parks' substantial-contribution application. DOC. # 2074 at 10; *see also* DOC. # 2074, DECLARATION OF LAPINSKI at 145.

McGinnis and H & L take joint credit in negotiating the terms of the option and warrant agreements. Under the option agreement, the Founders received options to purchase common stock from the Noteholders, who, as discussed earlier, received a 49% equity stake. H & L specifically takes credit for pointing out that because of the size of the unsecured-creditors class, issuing 11% warrants to the unsecured-creditor class could trigger public-company reporting requirements under the federal securities laws. H & L says its proposed alternative helped avoid the expense of public-company reporting. Under the agreement relating to the 14% warrants, the senior lenders were issued warrants to purchase up to 14% of outstanding AM-PAM common stock under certain conditions.

McGinnis and H & L also take joint credit in negotiating certain terms in the loan documents. Under the loan documents, the senior lenders agreed to provide post-confirmation financing to the reorganized debtors. The Founders would not go along, however, unless each Founder had the option "to purchase the operating subsidiary managed by that Founder upon the payment of a certain portion of the term loan indebtedness and payment of the revolving credit loan." DOC. # 2013 at 10. McGinnis and H & L say they "made a substantial contribution toward the closing of those loans on terms

that the Founders and the [debtors] could accept." *Id.* at 11. Winthrop says it "assumed an active and important role in the preparation of the post-confirmation loan and security agreements for the Debtors [when it] analyzed extensively numerous drafts of [loan documents, proposed detailed revisions] and undertook a prominent role in discussions among the Founders and the Debtors regarding the terms of the [loan documents]." DOC. # 2074 at 10–11.

The allocation agreement reflects the founders' agreement on how to determine how much cash each subsidiary contributed to the parent company and how much cash each subsidiary consumed, how to allocate recoveries of insurance and bond deposits among the debtors, and how to allocate debt obligations, restructuring expenses, and corporate overhead among the subsidiaries. McGinnis, H & L, and Winthrop all claim active roles in negotiating the allocation agreement.

Finally, all four founders and their respective counsel cite their role in reviewing, commenting, and making suggestions to the plan and supplemental plan documents. *See* DOC. # 2013 at 6 ("[McGinnis and H & L], in varying degrees, reviewed, analyzed, and suggested modifications to the Plan, the Plan amendments, and the Plan supplemental documents . . . .") *and* DOC. # 2074 at 8 ("Richey and Parks and their Counsel were involved actively in commenting on, and proposing modifications to, the Plan and the Plan Documents.").

**The four founders did not make a substantial contribution**

A pervasive problem with the four founders' substantial-contribution applications is that each founder (and their counsel) takes credit for much of the same activities, that is, reviewing documents and making comments. For example, all four

founders and their counsel cite the employment agreements as an example of how they made a substantial contribution. McGinnis and H & L both take credit for taking the lead in negotiating provisions for selecting members of AMPAM's board of directors. DOC. # 2013 at 7–8. McGinnis says it negotiated those provisions in the charter documents, and H & L says it did the same, but in the corporate-governance-and-voting agreement. *Id.* Perhaps the most startling example involves the 49% equity stake the Noteholders received under the confirmed plan. Christianson, Smith, and Richey, in addition to the indenture trustee, all point to that result as an example of their substantial contribution. *See* DOC. # 2013 at 8; DOC. # 2074, DECLARATION OF OPERA at 8.

The court has no reason to doubt that the four founders and their counsel worked and negotiated hard to achieve consensus on the issues and documents discussed above. *See, e.g.,* Exhs. 1—133 (emails primarily between Winstead (debtors' counsel), McGinnis, and H & L). Nevertheless, achieving a consensual resolution, while commendable, does not automatically constitute substantial contribution. *See Granite Partners,* 213 B.R. at 450. Negotiation and settlement, by its nature, is not a unilateral action. *Alumni Hotel,* 203 B.R. at 632.

 Christianson and Smith argue "it is unlikely that the reorganization of the [debtors] could have occurred without the substantial efforts of [Christianson and Smith and their] Counsel to obtain consensus among the various parties . . . ." DOC. # 2013 at 5. At the hearing, Christianson's counsel relied heavily on the but-for test.

Richey similarly argues that his efforts were "critical to the Debtors' successful reorganization." DOC. # 2074 at 11. That may very well be true, but if the court finds substantial contribution by one party in a crucial negotiation or settlement, then, under the founders' logic, the court would have to find substantial contribution in all the other parties' efforts in reaching a consensus. That is why the but-for test does not fully encompass the causal element of substantial contribution. Each creditor in a Chapter 11 case cannot claim it made a substantial contribution simply by cooperating. *See* note 3, *supra.* Choosing to not hold hostage the reorganization process does not make for substantial contribution. To hold otherwise would transform § 503(b) into a vehicle to reimburse every creditor that hires its own counsel. *Jack Winter,* 119 B.R. at 637.

Moreover, negotiating is an expected and routine activity in Chapter 11 cases, and absent some spectacular result, such as dramatically improving treatment of all creditors,[28] expected and routine activities do not constitute substantial contribution, *see Columbia Gas,* 224 B.R. at 548. It is reasonable, for example, to expect that some sort of allocation agreement would be negotiated in any reorganization involving disaggregation of debtors that were put together in a roll-up transaction.

Another problem with the four founders' taking credit for much of the same work is that the court has no easy way of knowing whether compensation is being sought for duplicative services. The court is not obligated to sift through the fee applications to determine which services are compensable and which services are not. *Granite*

---

**28.** *In re Geriatrics Nursing Home, Inc.,* 195 B.R. 34, 36–37 (Bankr.D.N.J.1996) (finding actual, demonstrable benefit to the estate when the creditor's activities resulted in a confirmed plan that paid all approved claims in full on the initial distribution date (and some with interest), but ultimately denying the creditor's substantial-contribution application because the creditor was acting primarily in its own interests).

*Partners,* 213 B.R. at 447. The burden is on the founders to show, by a preponderance of the evidence, which services are not duplicative and therefore eligible for reimbursement as substantial contribution. *Id.; see also U.S. Lines,* 103 B.R. at 433 ("It is well settled that uncertainties arising because of inadequate records must be resolved against the applicant.").

Problems of potential duplicative services aside, the four founders cannot even satisfy the baseline cost-benefit test. As in the indenture trustee's case, almost all of the four founders' activities benefitted primarily themselves. With the option agreement, counsel were protecting the founders' ability to regain greater control of the reorganized parent debtor by purchasing the Noteholders' 49% equity stake. With the employment agreements, corporate-governance-and-voting agreement, and the loan documents, counsel were protecting the founders' ability to step away from the less-than-successful roll-up transaction, as embodied by the parent debtor AMPAM, and to go back to making money with their respective subsidiaries as they did before AMPAM acquired them. In applying the cost-benefit test, the court must view benefits flowing to a limited class of creditors as having less weight. *DP Partners,* 106 F.3d at 673. H & L's pointing out that issuing 11% warrants may trigger public-company reporting requirements, and its solution in avoiding that possibility, may have constituted substantial contribution. No other party claims to have raised that issue, and the cost of complying with those requirements may have prevented the debtors' successful reorganization. If that were the case, then all creditors, and not just the founders, benefitted from H & L's attentiveness. However, no evidence was presented to indicate whether that indeed was the case.

As for the comments and suggested revisions to the plan, the court does not find any substantial contribution. The founders' applications do not go beyond conclusory statements. Richey and Parks alleged that their "extensive comments [on] the Plan Documents resulted in significant improvements in the terms thereof for the Debtors." DOC. # 2074 at 11. But they do not give the court the specifics of those significant improvements. Conclusory statements, of course, are given no weight. *9085 Mineral,* 119 B.R. at 249. Even if the founders gave examples of changes the debtors incorporated in the plan because of the founders' comments, that is no reliable indication of substantial contribution. As the *Granite* court explained:

> Additional language incorporated to quell an objector's concerns does not necessarily signify the merit or importance of the objection; if often means the opposite. Rather than argue over insubstantial and relatively unimportant disputes, the proponent simply makes the change, or the court directs it to be made, to move the process along. Further, it is not enough that the objecting party achieve some greater clarity in the document. He must demonstrate an actual or concrete benefit, such as ... added value.

*Granite,* 213 B.R. at 449.

Richey and Parks cite six cases to argue that a "party's contribution benefitting the negotiation, formulation, drafting, and/or confirmation of a Chapter 11 plan may constitute 'substantial contribution' under Section 503(b)." DOC. # 2074 at 7. Only one case out of the six they cite helps them. In *Encapsulation,* the court appears to adopt the but-for test. The *Encapsulation* court found that the "confirmation prospects took a positive turn when [the applicant's counsel] drafted what would become a joint disclosure statement

and engaged in meaningful negotiations with the debtor's attorney that resulted in a consensual plan of liquidation.... [Counsel's] efforts ... brought the debtor and the principal creditors to the point of agreement that appears to be the only achievable path that would result in a confirmed plan rather than a dismissal or conversion of the case—the consensual path." *In re Encapsulation Int'l, Inc.*, 1998 WL 801898 at *4 (Bankr.W.D.Tenn. Nov.9, 1998). This court rejects *Encapsulation* to the extent that the it adopts only the but-for test for the causal element of substantial contribution.

The Eleventh Circuit in *Celotex* also appeared to adopt the but-for test: "where, as here, evidence supports the conclusion that without [the creditor's] efforts a reorganization plan may not have been achieved, a substantial contribution has been demonstrated." *In re Celotex Corp.*, 227 F.3d 1336, 1340 (11th Cir.2000). But the Eleventh Circuit also recognized that the but-for test is only a part of the substantial-contribution inquiry. The applicant in *Celotex* provided "tangible and demonstrative benefit to the estate and the creditors of the estate. Again, not just [to the applicant]." *Id.* at 1340. Additionally, the U.S. Trustee, the debtor, and counsel for other creditors all agreed that the applicant's lawyer in *Celotex* went beyond mere representation of his client. *Id.* at 1339–1340. The founders have not shown how they benefitted any parties other than primarily themselves.

In *Cellular 101*, the creditor "formulated and presented the only reorganization plan that was put forth to the bankruptcy court. This [confirmed] plan resulted in the payment to creditors of 100% of the creditors' allowed claims with funds remaining for

the equity security holders." *In re Cellular 101*, 377 F.3d 1092, 1097 (9th Cir.2004). In our case, the founders did not draft any complete plan, and non-founder equity-security holders received nothing.

In *Pow Wow*, the creditor increased the payout to unsecured creditors from $35,805.63 (50 cents on the dollar) to $104,438.87 (100 cents on the dollar plus interest). *In re Pow Wow Campground, Inc.*, 296 B.R. 81, 88 (Bankr.D.N.H.2003). The *Pow Wow* court awarded the creditor $4,606.46, which yields a cost-benefit ratio of 6.7%. *Id.* The founders came nowhere close to making such a dramatic difference in payout; they failed to even establish a cost-benefit ratio for the court to consider.

The remaining cases that Richey and Parks cite reinforce that point. In *Jelinek*, the two debtors, Adolph and Leonard, did nothing for almost two years after filing for Chapter 11. *In re Jelinek*, 153 B.R. 279, 281 (Bankr.D.N.D.1993) (finding substantial contribution). FLB, the major secured creditor, got frustrated and filed its own plans, which were confirmed. *Id.* at 283. FLB's plans resulted in full payment of all unsecured claims in Adolph Jelinek's case, and 95% payment of all unsecured claims in Leonard Jelinek's case. *Id.* In *DP Partners*, the creditor incurred fees of $150,700 to generate an additional $3 million for all creditors. *DP Partners*, 106 F.3d at 670.

The final reason why the court cannot find substantial contribution by the founders concerns their status as substantial-contribution applicants. Christianson and Smith argue that they "are entitled to reimbursement of the legal fees and expenses incurred by them in each of the three roles that they played": as equity shareholder, director, and officer. DOC. # 2013 at 3.[29] The obvious problem with

---

**29.** Richey and Parks simply claim they made a substantial contribution as equity-security

holders. Doc. # 2074 at 6.

that argument is that § 503(b)(3)(D) does not list directors and officers as eligible substantial-contribution applicants. *See* 11 U.S.C. § 503(b)(3)(D) ("... a creditor, an indenture trustee, *an equity security holder,* or a committee ... other than a committee appointed under section 1102 ...") (emphasis added). Christianson and Smith admit to making no effort to "segregate the portion of legal fees and expenses incurred by [Christianson and Smith] in each capacity [because it] may not always be feasible given the frequent contemporaneous overlap in roles ..." DOC. # 2013 at 3.

The court cannot award Christianson and Smith attorneys' fees and expenses under § 503(b)(3)(D) to the extent that they acted in their capacity as directors and officers. Even if Christianson and Smith could somehow segregate the activities in which they were acting solely as equity-security holders, they do not show how the other equity-security holders benefitted. Under the confirmed plan, all holders of preferred and common stock receive nothing. DOC. # 1745 at 20–21.

Also, the four founders' applications share a similar problem with the indenture trustee's application. As directors and officers of the debtors in possession, the founders owed fiduciary duties to the estate. *See Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 355, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985) ("Indeed, the willingness of courts to leave debtors in possession is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.") (internal quotation marks omitted). "Both management and its counsel have fiduciary duties to an estate in bankruptcy." *In re JLM, Inc.,* 210 B.R. 19, 25 (2d Cir. BAP 1997) (listing cases); *In re Centennial Textiles, Inc.,* 227 B.R. 606, 612

(Bankr.S.D.N.Y.1998) (listing more cases). Christianson and Smith themselves acknowledge this: "Unlike other AMPAM equity security holders, [Christianson and Smith were both] director[s] and officer[s] of AMPAM through the Workout Period. This not only enabled each Workout Director to provide a substantial contribution to the [debtors' case], but *required that they do so in order to fulfill their respective fiduciary duties.*" DOC. # 2013 at 4 (emphasis added).

Just as the indenture trustee does not necessarily make a substantial contribution in fulfilling its fiduciary obligations, so too with the founders. The court will not create a rule that encourages directors and officers to act in their own interests, and perhaps to violate their fiduciary duties, by rewarding them under the guise of substantial contribution for acting primarily in their own interests.

**The founders' conflicts-of-interest argument**

■ The founders raised an argument at the hearing not addressed in their pleadings. They argued that the subsidiary debtors had different economic interests, which created conflicts of interest for Winstead, the debtors' counsel, and created issues that Winstead could not address by itself. They contend that the founders' counsel acted "as proxies for the ... reorganized subsidiaries," which provided substantial contribution to the case. MARCH 3, 2005 HEARING. The flaw in that argument is that McGinnis, H & L, Winthrop, and C & T were hired by the founders to represent their interests, not that of the subsidiaries, who all chose Winstead as their counsel.

As the U.S. Trustee corrected argued at the hearing, the proper way to resolve a conflicts-of-interest situation among related debtors is to hire separate counsel for each subsidiary under § 327. *See In re*

*Kendavis Indus. Int'l, Inc.*, 91 B.R. 742, 751–52 (Bankr.N.D.Tex.1988). However, no objections were filed to Winstead's employment as counsel for the debtors on the grounds that representing all the debtors would present irremediable conflicts of interest for Winstead. *See In re Global Marine, Inc.*, 108 B.R. 998, 1001–1004 (Bankr.S.D.Tex.1987); *see also* DOC. # 165 (final order allowing application to employ Winstead as counsel for the debtors in possession). The real conflict of interest was recognized by Winstead, who suggested that the founders retain their own counsel. MARCH 3, 2005 HEARING (testimony of Mr. Morris Davis, partner at McGinnis). Mr. Davis testified that the founders' interests were not identical to that of their respective subsidiaries. *Id.* Because the founders' counsel were hired to represent the founders and not the subsidiaries, and because representing the founders is not equivalent to representing the subsidiaries, the court rejects the founders' conflicts-of-interest argument.

In conclusion, the court DENIES the founders' substantial-contribution applications.

**The founders' indemnification argument**

 The four founders claim in the alternative that they are entitled to reimbursement of their attorneys' fees and expenses under indemnity provisions found in three documents: paragraph 14 of their employment agreement, article IX of AMPAM's second amended bylaws, and § 8.1 of the corporate-governance-and-voting agreement.

Paragraph 14 of their employment agreement states:

In the event Executive is made a party to any threatened, pending or completed action, suit or proceeding, whether civil, derivative, subrogation, criminal, administrative or investigative ... by reason of the fact that he is or was performing services for the Company or any of the AMPAM Companies ... then the Company shall indemnify Executive against and hold Executive harmless from any costs, expenses (including reasonable attorneys' fees as provided in this paragraph), liabilities, losses and exposures for Executive's services as an employee, officer and director of the Company (or any of AMPAM Companies or any successor) *to the maximum extent permitted under applicable law* .... The provisions of this paragraph 14 shall also extend to periods covered in any prior Employment Agreement between the Company or any of its predecessors and Executive.

Exh. 151B, tabs 12–14 (emphasis added).

Article IX of AMPAM's second amended bylaws states:

The Corporation shall, to the full extent permitted by Section 145 of Title 8 of the [Delaware General Corporation Law], as amended from time to time, indemnify all officers and directors of the Corporation whom it may indemnify pursuant thereto .... The provisions of this Article IX shall apply to acts or omissions occurring before or after the adoption hereof.

Exh. 151B, tab 7.

Finally, § 8.1 of the corporate-governance-and-voting agreement states:

*If approved by the Bankruptcy Court, AMPAM shall,* promptly following the date of this Agreement and the consummation of the Plan, *pay all reasonable transaction costs, fees and expenses* (including legal, accounting and other professional fees) *incurred* by each of Robert A. Christianson, Lloyd C. Smith, Charles E. Parks III and Robert Richey (each a "Negotiating Founder") and the Indenture Trustee *in connection with the negotiation, execution and performance of the Plan and the transactions*

*contemplated thereby,* provided, however, that AMPAM shall not pay or reimburse any transaction costs or expenses incurred by a Negotiating Founder on or before February 3, 2004 solely for such Negotiating Founder's own benefit in connection with the negotiation of the "buy out" by such Negotiating Founder under the Term Sheet.

Exh. 151B, tab 9 (emphasis added).

The court construes "applicable law" in the employment agreements to mean § 145 of the Delaware General Corporation Law (DGCL), which the bylaws refer to. Section 145 of DGCL generally addresses when a corporation may indemnify its directors and officers who are facing (in good faith and in the best interests of the corporation) any lawsuits or actions in their capacity as an officer or director. *See* DEL. CODE ANN. tit. 8, § 145 (2004).

None of the founders brought to the court's attention any post-petition actions or lawsuits that they were facing as directors and officers of the debtors. *See In re Keene,* 208 B.R. 112, 116 (Bankr. S.D.N.Y.1997) ("Corporate fiduciaries generally rely on the expectation of indemnification, and may recover their legal fees and expenses on an administrative basis, at least *to the extent they arise from defending postpetition conduct as an officer or director*") (emphasis added). In any case, the work for which the founders argue constitutes substantial contribution do not involve defending any lawsuit or action. The indemnity provisions therefore are not relevant to the founders' substantial-contribution claim.

The founders respond by pointing to § 145(f) of DGCL, which states:

indemnification and advancement of expenses provided by, or granted pursuant to, the other subsections of this section *shall not be deemed exclusive of any other rights to which those seeking indemnification* or advancement of expenses *may be entitled under any bylaw, agreement, vote of stockholders or disinterested directors or otherwise,* both as to action in such person's official capacity and as to action in another capacity while holding such office.

DEL. CODE ANN. tit. 8, § 145(f) (2004) (emphasis added).

The founders appear to argue that § 145(f), combined with the broad indemnity language in their employment agreements and the corporate-governance-and-voting agreement, allows the reorganized debtors to reimburse them for their attorneys' fees and expenses, even though those fees and expenses were not incurred in defending against a lawsuit as contemplated by § 145.

That argument is not supported by the case law interpreting § 145(f). Courts agree that a corporation may, under § 145(f), provide indemnification rights beyond that provided by § 145(a) and § 145(b), but those indemnification rights must be consistent with the substantive portions of § 145, such as the requirement of good faith in §§ 145(a) and (b). *See Owens Corning v. Nat'l Union Fire Ins. Co.,* 257 F.3d 484, 494 (6th Cir.2001); *Waltuch v. Conticommodity Servs., Inc.,* 88 F.3d 87, 91–92 (2d Cir.1996) (discussing Delaware cases). As the Second Circuit put it, § 145(f) "permits additional rights to be created, but *it is not a blanket authorization to indemnify directors against all expenses, fines, or settlements of whatever nature and regardless of the directors' conduct.* The statutory language is circumscribed by limits of public policy . . . ." *Id.* at 92 n. 7 (emphasis added). A requirement of indemnification under § 145 is that the director or officer must be defending some lawsuit or action. *See Owens Corning,* 257 F.3d at 494; *see also Keene,* 208 B.R. at 116. The founders

did not face any lawsuit or action related to the activities for which they are claiming substantial contribution. The court is therefore back to its original conclusion: the indemnity provisions do not come into play.

Richey and Parks cite three cases in arguing that a debtor-corporation must indemnify its officers and directors to the full extent provided by the debtor's by-laws. DOC. # 2074 at 17–18, *citing In re Sahlen & Associates, Inc.,* 113 B.R. 152 (Bankr.S.D.N.Y.1989); *In re Bicoastal Corp.,* 131 B.R. 499 (Bankr.M.D.Fla.1991); and *Fleischer v. Federal Deposit Ins. Corp.,* 70 F.Supp.2d 1238 (D.Kan.1999). Article IX of AMPAM's second amended bylaws, however, allows indemnification only to the extent that § 145 of the DGCL allows it, and the cases cited by Richey and Parks do not alter the court's analysis. In the latter two cases the officer or director was facing some sort of lawsuit or action. *See Bicoastal,* 131 B.R. at 500 (law firm defending former board of directors in litigation regarding corporate governance); *Fleischer,* 70 F.Supp.2d at 1240–41 (directors and officers indemnified for successfully defending lawsuit brought by savings and loan association). *Sahlen,* unfortunately, is not clear on whether the director was facing any lawsuit but it appeared the director was facing an SEC investigation. *Sahlen,* 113 B.R. at 153. Because the court rejects the founders' indemnification argument, § 8.1 of the corporate-governance-and-voting agreement, which expressly requires the court's approval, does not come into play.

## Conclusion

For the reasons stated above, the court DENIES the indenture trustee's substantial-contribution claim (DOC. # 1868), DENIES Christianson and Smith's substantial-contribution claim (DOC. # 2013), and DENIES Richey and Parks' substantial-contri-bution claim (DOC. # 2074). Orders consistent with this decision will be entered separately.